[Cite as *In re E.R.*, 2017-Ohio-7188.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In re: | : | |
| E.R. | : | No. 17AP-82 |
| | | (C.P.C. No. 13JU-11897) |
| (J.R., | : | |
| | | (REGULAR CALENDAR) |
| Appellant). | : | |
| In re: | : | |
| S.L.J. | : | No. 17AP-84 |
| | | (C.P.C. No. 13JU-12877) |
| (J.R., | : | |
| | | (REGULAR CALENDAR) |
| Appellant). | : | |

D E C I S I O N

Rendered on August 10, 2017

**On brief:** *Yeura R. Venters,* Public Defender, and *John W. Keeling,* for appellant.

**On brief:** *Robert J. McClaren,* for appellee Franklin County Children's Services.

APPEALS from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

HORTON, J.

{¶ 1} Appellant-mother, J.R., appeals from two judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch ("trial court"), that terminated her parental rights and granted permanent custody of her minor children, E.R. and S.L.J., to Franklin County Children Services ("FCCS"). For the following reasons, we affirm.

**I. FACTS AND PROCEDURAL BACKGROUND**

{¶ 2} J.R. is the mother of four children. Her two older children live with their respective fathers and are not the subject of this case. E.R. was born on April 12, 2012, and S.L.J. was born on September 16, 2013. (Jan. 9, 2017 Tr. at 21.)

{¶ 3} When J.R. suffered "a mental breakdown" that required her to be hospitalized the summer before S.L.J. was born, she sent her children to live with her sister. (Tr. at 22.) J.R.'s sister was granted temporary custody of the children on July 17, 2013. After receiving allegations that one of her sister's children had sexually abused one of J.R.'s older children, FCCS filed a dependency complaint on behalf of E.R. on August 27, 2013. The complaint also stated that there had been a previous allegation of sexual abuse of J.R.'s other child by her father, and that J.R.'s sister would not allow the caseworker access to her home or the children. (Aug. 27, 2013 Compl., Case No. 17AP-82.)

{¶ 4} While at the hospital for S.L.J.'s birth in September, J.R. was involuntarily hospitalized for mental health reasons. (Tr. at 23-25.) FCCS filed a dependency complaint on behalf of S.L.J. two days after his birth and he was placed in a foster home at that time. (Sept. 18, 2013 Compl.; Sept. 27, 2013 Case Plan, Case No. 17AP-84.) In November, J.R. was incarcerated for five and one-half months after pleading guilty to harassment with a bodily substance. (Tr. at 50-51). During her incarceration, the trial court adjudicated both E.R. and S.L.J. as dependent minors. (Oct. 15, 2013 Jgmt. Entry, Case No. 17AP-82; Dec. 20, 2013 Jgmt. Entry, Case No. 17AP-84.) E.R. was placed in the temporary custody of his aunt, J.R.'s sister. (Oct. 9, 2013 Mag.'s Order, Case No. 17AP-82.) However, after Columbus police found E.R. unattended in his aunt's house on May 27, 2014, her temporary custody of him was terminated and he was returned to the custody of FCCS. (May 28, 2014 Mot.; May 29, 2014 Mag.'s Order, Case No. 17AP-82.) On May 29, 2014, E.R. was placed in the foster home where S.L.J. had been placed since his birth. (Tr. at 125.)

{¶ 5} On October 2, 2014, J.R. was hospitalized again. (Tr. at 33.) She spent three weeks in a homeless shelter after being discharged before being hospitalized again in March 2015, and was subsequently discharged on April 8, 2015. (Tr. at 35-37.) FCCS filed motions for permanent custody of E.R. and S.L.J on April 24, 2015. J.R. was once again hospitalized for mental health reasons on May 4, 2015. (Tr. at 35-37.)

{¶ 6}   The trial court held an evidentiary hearing on FCCS's motion on January 9 and 10, 2017. J.R. testified that she was schizophrenic and, although "not sure," believed that she had been hospitalized for the condition "[a]t least five times." (Tr. at 25-26.) J.R. admitted that she had been hospitalized three times since S.L.R's birth. (Tr. at 26-27.) She remembered that her hospitalization in October 2014 occurred after she was found running down a street, speaking gibberish, terrified that a raccoon she had seen would attack her. (Tr. at 33-34.) J.R. stated that she was voluntarily hospitalized in May 2015 after requesting treatment from her caseworker, and admitted that on admission had exhibited paranoid and grandiose thoughts. (Tr. at 38.) J.R. testified she believed that if her children were returned to her, she would be able to rely on "family help" to care for them if she were hospitalized again. (Tr. at 27.)

{¶ 7}   At each hospitalization, J.R. admitted to using alcohol and marijuana. (Tr. at 35, 39.) She denied that the marijuana use was habitual or that she used it to self-medicate. (Tr. at 35.) However, she also stated that her marijuana use "became an addiction," and that it "took away from * * * being actually in this moment of having to suffer," relieving her of negative thoughts. (Tr. at 39.) J.R. also stated that she believed the marijuana use caused her schizophrenia, claiming that she had been free of the condition before she started using it. *Id.* J.R. admitted to ongoing and current use of marijuana, but stated that she was "seeking classes" and going "to AA meetings" for her use. (Tr. at 40-41.)

{¶ 8}   During her most recent hospitalization, J.R. told her doctors that she did not need medication for her schizophrenia. (Tr. at 41-42.) However, she denied that she had refused to take her medication while in the hospital, and stated that whether it was a good or bad day, she had always taken it. (Tr. at 42-43.) She admitted that she had gotten into two physical fights during that hospitalization. *Id.*

{¶ 9}   J.R. admitted that she had not had stable housing since the beginning of this case. (Tr. at 44.) She described periods of time that she had lived with her sister or father, been in a homeless shelter, and moved in with a friend until July 2016, when she entered a program that allowed her to have her own apartment. (Tr. at 44-48.) She had been able to remain in that apartment until the time of her testimony, and described  her previous lack of stable housing as a "one-time thing" that arose from losing her apartment

when she had been incarcerated. (Tr. at 49.) J.R. currently had a one bedroom apartment, but had an arrangement with her current landlord that she would be "immediately" provided a larger apartment if her children were returned to her. (Jan. 10, 2017 Tr. at 55.)

{¶ 10} J.R. admitted that she had stated to the FCCS caseworker that she would no longer participate in any drug screens, based on her belief that she had "done everything" FCCS asked of her, and that she was not obligated to comply with the agency's requirements if "it's not going to bring the kids home." (Jan. 9, 2017 Tr. at 54.) However, in her testimony she asserted that she was continuing with the case plan, visiting the children, and going for drug testing. When asked if she believed she was able to take care of her children, J.R. replied: "Yes, I do in every form, shape and way, mentally physically and emotionally, I know that I can confirm that I can care for my children." (Tr. at 55.) She then stated that, although she had used drugs two weeks before, "it's not something that I will continue to do around my kids." *Id.* J.R. asserted that she would be able to stop, based on her willingness to "commit to my kids," and that she loved them. (Tr. at 55-56.)

{¶ 11} The trial court then heard testimony from Cassandra Davala, the caseworker assigned to the family from August 2013 until September 2016. (Tr. at 62-65.) Ms. Davala testified that both children were in the same foster home, where each had been placed after FCCS obtained custody of them. At the time of trial, E.R. had been with the foster family for 32 months and S.L.J. had been there for 40 months. Ms. Davala summarized the issues the case plan required J.R. to remedy as treatment for her mental health problems, parenting skills through education, alcohol and drug treatment, and income and housing stability. (Tr. at 71.) Although J.R. at times had been "relatively compliant" with the case plan, there had been no time when Ms. Davala believed that it would be safe for the children to return to live with their mother. *Id.* In particular, she cited J.R.'s ongoing mental health issues and inability to parent the children, which she had observed during supervised visits. (Tr. at 72.)

{¶ 12} Ms. Davala described several of the many visits that she had supervised over a two-year period. (Tr. at 73-120.) On multiple occasions, J.R. was dazed, lethargic, and unable to focus on more than one child at a time. (Tr. at 73, 75, 95-96, 101, 103-04, 109-110.) During one visit when J.R. was dazed and stated that her "vibe is messed up right

now," the caseworker had to hold J.R. during the entire visit. (Tr. at 96.) J.R. was at times so tired and lethargic that she appeared to be falling asleep. (Tr. at 95.)

{¶ 13} The caseworker also described "concerning behaviors" by J.R. that led her to worry about the children's safety. (Tr. at 75.) J.R. was unable to break food down into pieces small enough for a child until the caseworker corrected her. (Tr. at 79, 100-01.) J.R. did not correct E.R. when he was jumping on furniture until the caseworker did. (Tr. at 89.) On a later visit, J.R. allowed S.L.J. to climb on furniture, which Ms. Davala described as a "safety risk." (Tr. at 99.) On another visit, J.R. walked around the room holding S.L.J.'s hands, who was unable to walk because of his age, while J.R. told him to walk. On the same visit, she picked up E.R. and held him "up in the air at a very awkward, unsafe position," and had to be asked repeatedly to put him down. (Tr. at 95.) Another time, E.R. tipped backwards in a chair after the caseworker told J.R. she should monitor the behavior because he might fall. (Tr. at 101.) Ms. Davala stated that without redirection, J.R. was unable to recognize safety risks to the children. (Tr. at 103.)

{¶ 14} Ms. Davala also had "ongoing concerns" with J.R.'s ability to engage in "age-appropriate parenting," and even "her ability to understand what is going on with the children at times." (Tr. at 75.) J.R. would tell S.L.J. to stop crying when he was too young to do so. *Id.* When playing with her older son, who was seven, she called him a "preschooler" and a "baby," and, at another time, said "come here my sexy baby." (Tr. at 99.) At a later visit, J.R. "said 'My sexy baby' to one of the children and immediately said, 'Oh, that's not age-appropriate' and then said 'Oh, my sexy boy' again." (Tr. at 112.) J.R. also corrected E.R. for behavior that he did not engage in. (Tr. at 106.)

{¶ 15} Ms. Davala testified that J.R. had only completed 51 out of 135 drug screens, and was not consistently completing them by the time of trial. (Tr. at 77.) On multiple occasions, J.R. told both E.R. and the caseworker that she could hear their thoughts. (Tr. at 108-09.) J.R. told her older daughter that she did not need treatment for drugs or alcohol. (Tr. at 97.) On one occasion, she spoke in a "strange accent" to her older daughter, who asked her to stop. (Tr. at 102.) According to Ms. Davala, J.R. admitted that she did not consistently take her medication. (Tr. at 76.) She also claimed that she was not schizophrenic, and instead blamed her condition on marijuana use. (Tr. at 81.) On one visit, J.R. yelled at Ms. Davala and protested about having to get mental health treatment

as part of her case plan. (Tr. at 87.) On another visit, J.R. accused Ms. Davala of lying and having ex parte communications with the magistrate. (Tr. at 93.) J.R. initially refused to allow Ms. Davala to visit her new apartment. (Tr. at 78.)

{¶ 16} Ms. Davala described J.R. as "semi-compliant" with her mental health treatment, and stated that she did complete alcohol and drug treatment, as well as parenting classes. (Tr. at 129-33.) J.R. regularly visited the children, and had overall "good" compliance with what she was required to do. (Tr. at 135, 145.) However, J.R. never progressed to the point where Ms. Davala could allow unsupervised visits with the children. (Tr. at 152.) J.R. did not demonstrate any skills learned from the parenting classes she had taken and refused to take another, although a psychologist had recommended that she do so. (Tr. at 153.) Ms. Davala had "ongoing age-appropriate parenting concerns," as well as "mental health concerns and drug abuse concerns." (Tr. at 152.) She noted that J.R. had admitted to still using drugs after completing the alcohol and drug treatment program. *Id.*

{¶ 17} Ms. Davala observed that the children were not bonded to J.R. (Tr. at 120.) She described multiple visits where the children were distant from J.R. or refused to hug or kiss her. (Tr. at 93, 95, 103-04, 108, 117.) In contrast, the children were bonded with their foster parents. (Tr. at 126.) S.L.J. called them "mommy" and "daddy" and asked for them during visits. (Tr. at 117-18.) Ms. Davala believed that the foster parents would allow J.R. to visit the children. (Tr. at 127.) The children's biological father had made no attempt to comply with the case plan and the children had no bond with him. (Tr. at 125.) Ms. Davala recommended granting permanent custody. (Tr. at 127.)

{¶ 18} Douglas Pawlarczyk, a licensed psychologist, also testified. He had performed several evaluations of J.R., as well as a parent-child observation of her with E.R. and S.L.J. (Tr. at 163-64.) He conducted his first evaluation of J.R. on May 30, 2014. (Tr. at 165.) At the time, J.R. "had some problems with paranoia and illogical thinking," and admitted to Dr. Pawlarczyk that she had made a false allegation regarding the sexual abuse of her son. (Tr. at 167.) Because J.R. gave "defensive" and "guarded" answers to a personality test, it produced indeterminate results, although the results did indicate narcissism. (Tr. at 169-70.) At that time, Dr. Pawlarczyk recommended close monitoring of her mental health treatment, referral to Narcotics Anonymous, and psychotherapy

sessions to monitor her response to medication and "develop strategies to assume more responsible behaviors." (Tr. at 170.)

{¶ 19} On July 1, 2016, Dr. Pawlarczyk evaluated J.R. again. (Tr. at 171.) He believed that J.R. had a "psychotic disorder," based on a number of symptoms that he observed. (Tr. at 174.) J.R. described auditory hallucinations of varying severity that, at times, "would tell her to do something aggressive when they spoke to her." *Id.* J.R.'s thinking was "illogical" and she often contradicted herself. *Id.* At times she used "unusual words," and her speech was disorganized or didn't make sense. (Tr. at 174-75.) J.R. claimed to have stopped using marijuana 45 days before the appointment. Although she displayed little emotion, J.R. would at times tear up without crying, even when nothing emotional was discussed. (Tr. at 178.) She often had a "blank stare" and appeared preoccupied and non-responsive, which Dr. Pawlarczyk found to be a concern if she had to watch children. *Id.* J.R.'s cognitive abilities tested in the "mild range of intellectual deficiency." (Tr. at 181.) Dr. Pawlarczyk believed that if J.R. had been able to focus better, her scores would have tested higher, and that "her true range of functioning [was] probably more low borderline range." *Id.* He diagnosed J.R. with "an unspecified psychotic disorder," which, in the newer DSM-V, is referred to as unspecified schizophrenia spectrum disorder. (Tr. at 180.)

{¶ 20} Dr. Pawlarczyk recommended treatment for schizophrenia and marijuana use. He did not attribute J.R.'s psychosis to the marijuana use because she had symptoms even when not using. (Tr. at 181.) He expressed concern about J.R.s' admission that she had smoked marijuana two weeks before the trial because of the unknown effect that it would have in conjunction with the injected medication to treat her schizophrenia. (Tr. at 182.) He also described J.R.'s refusal to attend further parenting classes as "a big concern." *Id.*

{¶ 21} Dr. Pawlarczyk also performed a parent-child observation of J.R. with the children in July 2016. (Tr. at 185.) Based on his observations, he concluded that "there would be a number of problems" if J.R. were to parent the children. (Tr. at 186.) He cited her inability to "test reality" because of the "continued auditory hallucinations," and expressed concern over the effect of her disorganized thinking on a child. *Id.* Dr. Pawlarczyk stated that J.R. did not appear to have "a knowledge of parenting techniques

to use with kids that were two and four." *Id.* Dr. Pawlarczyk found it "hard to say" whether J.R. would be able to parent the children. (Tr. at 187.) He stated that his three main areas of concern were her consistency with taking medication, becoming substance free, and obtaining parenting skills through education. *Id.* In his opinion, J.R. had shown no improvement from his first evaluation of J.R. to the second one two years later. (Tr. at 204-05.)

{¶ 22} The trial court also heard from Janice Flowers, the guardian ad litem for the children. (Tr. at 206.) In Ms. Flowers' opinion, granting the motion for permanent custody would be in the best interest of both E.R. and S.L.J. (Tr. at 207.) The children were too young to express their wishes on the matter. Based on Ms. Flowers' observations, S.L.J. viewed his foster mother as his mother and did not have a maternal bond with J.R. (Tr. at 208.) E.R. was more bonded with J.R. when he initially arrived at the foster home, at which time he was "reserved" and "would cry a lot." (Tr. at 209.) Since then, E.R. has "blossomed" somewhat and considers a foster brother his best friend. *Id.* Ms. Flowers testified that E.R. recognizes both his foster mother and J.R. as mothers, but is bonded to his foster family and considers it his family. Ms. Flowers described the children as stable and well-adjusted. (Tr. at 209-10.)

{¶ 23} Ms. Flowers stated that she could not recommend that the children be returned to J.R. Although Ms. Flowers believed that J.R. had dealt with her mental health issues "the best that she can," she did not believe that J.R. could effectively parent the children. (Tr. at 210.) She also cited the instability in housing as another concern. (Tr. at 211.) Ms. Flowers did not believe that it would be safe for the children to be returned to J.R.'s custody. (Tr. at 225.)

{¶ 24} The current caseworker, Samantha Manning, also testified. She was assigned to the case in August 2016. (Jan. 10, 2017 Tr. at 7.) During a visit that Ms. Manning supervised on November 14, 2016, J.R. stated that she did not have any mental health or substance abuse problems, and would therefore not participate in any case services. (Tr. at 8.) J.R. blamed her missed drug screens on an inability to use her phone because she did not have minutes, but Ms. Manning saw J.R. use her phone at that visit and at a later visit in December 2016. (Tr. at 9-10.) J.R. had not called in for a drug screen since September 30, 2016. (Tr. at 18.)

{¶ 25} Ms. Manning testified that J.R. had reported in July 2016 that she no longer received Social Security Income ("SSI"). When Ms. Manning asked J.R. why she no longer received SSI at a home visit on December 15, 2016, J.R. replied that she did not know.[1] J.R. reported that she had just lost a job that she had only worked at for four days, owed $98.00 in back rent, and was relying on her sister to make the rent payment. (Tr. at 10-11.) Ms. Manning also described J.R.'s current home as "a very small apartment" that was "very messy." (Tr. at 11.)

{¶ 26} Ms. Manning also described the visits she had supervised, over 20 since June 23, 2016. (Tr. at 13, 22.) J.R. did not miss any visits with the children during that time. (Tr. at 25.) Ms. Manning stated that E.R. and S.L.J. were hesitant to walk to the visitation room, and S.L.J. at times cried in the lobby and asked not to go. (Tr. at 12.) Although J.R. attempted to engage with the children, they were typically non-responsive and played by themselves. (Tr. at 13.) According to Ms. Manning, the visits had "gotten worse" over time, as the children had "become more upset" during the visits. *Id.* At times, E.R. would cry when J.R. would demand to know why he wasn't speaking to her. Ms. Manning opined that the children were not bonded to their mother. Their biological father had not responded to Ms. Manning's multiple attempts to contact him. (Tr. at 14.)

{¶ 27} Like Ms. Davala, Ms. Manning testified that both children appeared "very much engaged" and "well bonded" with their foster parents after observing them in the home. (Tr. at 15.) She described them as "happy," "playful," "running around with the other children," and wanting to be with and communicate with their foster mother. *Id.* Ms. Manning contrasted this with the children's behavior during visits with J.R., where they appeared disengaged and inactive. *Id.*

{¶ 28} Ms. Manning stated that she could not recommend returning the children to J.R. She cited J.R.'s lack of "impulse control, as eviden[ced] by her continued abuse of cannabis," and stated that J.R. had admitted that she had abused cannabis two weeks before the December 15, 2016 home visit. (Tr. at 16.) Ms. Manning stated that J.R. did not have a bond with the children or "accurate perceptions" of them, and was not "emotionally aligned" with them. *Id.* She recommended granting the motion for permanent custody. *Id.*

---

[1] J.R. testified that her SSI income would resume in February 2017. (Jan. 10, 2017 Tr. at 56.)

{¶ 29} Edward Alpha, a case manager for her mental health treatment, testified on behalf of J.R. (Tr. at 34, 36.) Mr. Alpha was responsible for making sure that J.R. complied with her medications and psychiatric appointments. He had only been assigned to her case for one month. He stated that she had been compliant with her last three scheduled appointments. (Tr. at 38-39.) In addition, Mr. Alpha was familiar with her history going back to the previous May, during which time J.R. had been compliant with her treatment requirements. (Tr. at 40-41.) Mr. Alpha was "not sure there's anything that she should be doing [that] she's not doing." (Tr. at 42.)

{¶ 30} The final testimony heard in the trial court came from Leslie Armstrong, J.R.'s guardian ad litem. Ms. Armstrong was appointed J.R.'s guardian ad litem on November 3, 2014. (Tr. at 80-81.) She testified that J.R. had been at her "best level of functioning" over the previous year and one-half, and, in particular, had been "pretty stable" during the previous six to eight months. (Tr. at 82.) Ms. Armstrong stated that, although J.R.'s "level of functioning" was "fairly good" compared to times in the past, she would have "concerns about the children" returning to J.R.'s custody. (Tr. at 83.) However, she also criticized FCCS for never allowing the children to do a visit with J.R. in her home "so that there could be some assessments made in a real world [setting] as opposed to the artificial world" of the visiting room at the agency. (Tr. at 84.) Thus, Ms. Armstrong believed it was "relatively unknown" how J.R. would function in a home with the children. *Id.* Ms. Armstrong pointed out that Dr. Pawlarczyk did not believe J.R.'s interactions with the children would cause them harm. Nevertheless, she stated that she shared his concerns about returning the children to J.R. "without any in-home services being place." (Tr. at 85.) Ms. Armstrong also disputed Ms. Manning's description of J.R.'s apartment. She testified that the apartment was "neat and clean," and described the kitchen as "well-organized." (Tr. at 87.) Ms. Armstrong did not believe that granting FCCS permanent custody of the children would be in J.R.'s best interest. (Tr. at 85.)

{¶ 31} The trial court issued a decision and judgment entry on January 27, 2017 with findings of fact and conclusions of law. It found that clear and convincing evidence existed that the children had been in custody for longer than the 12-month period required by R.C. 2151.414(B)(1)(d). (Decision at 11.) The trial court considered the relevant factors under R.C. 2151.414(D) to determine the best interest of the children.

(Decision at 12-14.) Under R.C. 2151.414(D)(1)(a), a court may consider "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child." When considering this factor, the trial court stated that E.R. and S.L.J.:

> [A]re strongly bonded to their foster parents, foster siblings, and each other. They have resided in these homes for most of their lives. [E.R.] demonstrates some remaining bond with his Mother and refers to "having two mothers." The children have a bond with their half siblings which is fostered by the foster parents. This home is a potentially adoptive home which appears willing to continue and [sic] foster the children's relationship with their biological mother, even if the children are made available for adoption. There is no evidence that the children have a bond with their father.

(Decision at 13.)

{¶ 32} When considering "[t]he wishes of the child, as expressed directly by the child or through the child's *Guardian ad Litem*, with due regard for the maturity of the child" under R.C. 2151.414(D)(1)(b), the trial court found that E.R. and S.L.J were "too young to express their wishes or concerns." (Emphasis sic.) *Id.*

{¶ 33} The trial court indicated that it had considered "the custodial history" of E.R. and S.L.J., in accordance with R.C. 2151.414(D)(1)(c), by generally referring to its findings summarizing their history in foster care. *Id.* When considering the children's "need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency" under R.C. 2151.414(D)(1)(d), the trial court stated:

> These children are desperately in need of a legally secure permanent placement after almost or more than three years in foster care. Mother has only recently demonstrated some mental health stability. The period of time that the children have been in foster care leaves them exceptionally vulnerable to the need of permanent secure placement going forward. Although mother has apparently worked hard on her mental health stability, there [are] still significant concerns raised by the most recent psychological evaluations as to her ability to maintain this stability so as to adequately care for and provide her children with a stable and permanent home. It is evident that mother's mental health state can be triggered by stress. She continues to smoke marijuana despite her own testimony

> indicat[ing] such use directly affects her psychotic state. To return the children to her care would, in this trier of facts' mind, place them at serious risk of harm and/or deny them permanent stable housing.

(Decision at 13-14.)

{¶ 34} The statute also states that a court may consider "any of the factors in divisions (E)(7) to (11)" under R.C. 2151.414. R.C. 2151.414(D)(1)(e). The trial court considered the biological father's abandonment of E.R. and S.L.J., in accordance with R.C. 2151.414(E)(10). (Decision at 14.) Finally, when considering other "relevant factors," as allowed by R.C. 2151.414(D)(1), the trial court noted that "[t]he Guardian ad Litem and the involved case workers believe it is in the children's best interest that the Motions be granted and they be placed up for adoption." *Id.*

{¶ 35} Based on the foregoing, the trial court found that granting the motion would be in the best interest of both children. *Id.* Thus, the trial court sustained FCCS' motion, granted permanent custody of E.R. and S.L.J. to the agency, and divested J.R. and the biological father of all parental rights of the children. (Decision at 15.)

{¶ 36} J.R. filed timely notices of appeal. She asserts the following assignment of error in both appeals:

> THE TRIAL COURT ERRED WHEN IT GRANTED THE MOTION FOR PERMANENT CUSTODY WHEN THE AGENCY FAILED TO MAKE REASONABLE EFFORTS TO RETURN THE CHILD TO HIS HOME AND TO THEREFORE SHOW THAT IT WAS IN THE BEST INTEREST OF THE CHILDREN TO TERMINATE PARENTAL RIGHTS.

## II. STANDARD OF REVIEW

{¶ 37} A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312. Permanent custody judgments which are supported by some competent, credible evidence going to all essential elements of a case will not be reversed as being against the manifest weight of the evidence. *In re Brofford*, 83 Ohio App.3d 869, 876-77 (10th Dist.1992). "In reviewing a judgment granting permanent custody to FCCS, an appellate court 'must make every reasonable

presumption in favor of the judgment and the trial court's findings of facts.' " *In re J.T.*, 10th Dist. No. 11AP-1056, 2012-Ohio-2818, ¶ 8, quoting *In re P.G.*, 10th Dist. No. 11AP-574, 2012-Ohio-469, ¶ 37. When " 'evidence is susceptible of more than one construction,' " a reviewing court must interpret it in a light " 'consistent with the verdict and judgment, [and] most favorable to sustaining' " the judgment of the trial court. *In re Brooks*, 10th Dist. No. 04AP-164, 2004-Ohio-3887, ¶ 59, quoting *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19 (1988).

## III. ANALYSIS

{¶ 38} A parent's liberty interest "in the care, custody, and control of their children" is a fundamental right guaranteed by the Due Process Clause of the Fourteenth Amendment. *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Thus, termination of parental rights "should be an alternative of 'last resort.' " *In re D.A.*, 113 Ohio St.3d 88, 91, 2007-Ohio-1105, ¶ 11, quoting *In re Cunningham*, 59 Ohio St.2d 100, 105 (1979). A parent faced with the state's motion for permanent custody "must be afforded every procedural and substantive protection the law allows." *Id.* at ¶ 10, quoting *In re Hayes*, 79 Ohio St.3d 46, 48 (1997). "The fundamental interest of parents is not absolute, however. Once the case reaches the disposition phase, the best interest of the child controls." *In re D.A.* at ¶ 11 (reversing a trial court's decision to terminate parental rights based "solely on the limited cognitive abilities of the parents"). To terminate parental rights, a court must find "by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody," after considering the best interests of the child in light of a number of statutory factors. R.C. 2151.414(B)(1).

### A. Manifest Weight

{¶ 39} J.R. does not expressly present a manifest weight challenge to the trial court's decision in her assignment of error or the arguments in her briefing. Nevertheless, in the interest of justice and due to the fundamental right at stake in this appeal, we consider such a review warranted. *See, e.g., Hungler v. Cincinnati*, 25 Ohio St.3d 338, 341 (1986) (interpreting the "discretionary" language of App.R.12(A) to allow an appellate court to consider "errors not assigned by the parties").

{¶ 40} There is a "two-step approach" a trial court employs when determining a motion under R.C. 2151.414 for granting permanent custody of a child to a public children services agency. *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 18. Under the statute, "a trial court may grant permanent custody if, after a hearing, it determines by clear and convincing evidence, that (1) any of the circumstances in R.C. 2151.414(B)(1)(a) through (d) exist, and (2) such relief is in the best interest of the child." *In re B.B.H.*, 10th Dist. No. 14AP-882, 2015-Ohio-2347, ¶ 15.

{¶ 41} First, the trial court found that the applicable circumstance of R.C. 2151.414(B)(1)(a) through (d), was that of subsection (d), which allows for a grant of permanent custody when "[t]he child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period."[2] Competent, credible evidence supported this determination. At the time of trial, Ms. Davala testified that the children had been in the custody of FCCS for over three years. (Jan. 9, 2017 Tr. at 59.) E.R. had been in a foster home for 32 months and S.L.J. had been there for 40 months. (Tr. at 71.)

{¶ 42} Second, competent and credible evidence supported the six R.C. 2151.414(D)(1) factors considered by the trial court when it determined that granting the motion for permanent custody would be in the best interest of the children. When discussing "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child," under R.C. 2151.414(D)(1)(a), the trial court emphasized the strong bonds between both E.R. and S.L.J. and their foster parents and siblings. The trial court described the environment as "a potentially adoptive home" for the children. Both case workers presented evidence of the bonds between both the children and their foster family as was presented in their testimony. (Jan. 9, 2017 Tr. at 117-18, 126; Jan. 10, 2017 Tr. at 15). The guardian ad litem also testified to these bonds. (Jan. 9, 2017 Tr. at 207-10.) The trial court acknowledged that E.R. had "some remaining

---

[2] The trial court's decision quoted the language of R.C. 2151.414(B)(1)(d) that existed before the General Assembly amended the statute on May 14, 2008. 2007 Ohio S.B. 163. The previous language specified that the 12-month period of temporary custody must occur within a consecutive 22-month period that ended "on or after March 18, 1999." *Id.* Applying the previous version of the statute has no effect on the analysis because both children were born well beyond this date, and the statutory language was not made retroactive.

bond" with J.R, a finding that is consistent with the testimony of the guardian ad litem. (Tr. at 209-10). The trial court also noted that the foster parents were willing to allow J.R. to continue to have a relationship with the children after adoption. (Tr. at 127.)

{¶ 43} When considering R.C. 2151.414(D)(1)(b) regarding the children's wishes, the trial court observed that E.R. and S.L.J. were "too young to express their wishes or concerns." This observation was based on the testimony of the guardian ad litem. (Tr. at 208.) When considering the children's "custodial history" under R.C. 2151.414(D)(1)(c), the trial court referenced the findings made earlier in its decision. These findings recounted in detail J.R.'s inability to care for E.R. before her sister obtained custody of him, and E.R.'s subsequent removal to a foster home. (Jan. 27, 2017 Decision at 2-3.) These findings were supported by the testimony of J.R. and Ms. Davala. (Jan. 9, 2017 Tr. at 21-23, 68.) The trial court also described S.L.J.'s birth and immediate placement in a foster home due to J.R.'s involuntary hospitalization. (Jan. 27, 2017 Decision at 3.) Again, these findings were supported by the testimony of J.R. and Ms. Davala. (Jan. 9, 2017 Tr. at 23-24, 69-70.)

{¶ 44} Competent, credible evidence also supported the trial court's consideration of R.C. 2151.414(D)(1)(d), which concerns "[t]he child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." The trial court described the children as "desperately in need of a legally secure permanent placement" after a three-year period in foster care. As discussed, Ms. Davala testified to the length of time the children had been in foster care. The trial court also noted that J.R. had "only recently demonstrated some mental health stability." This observation was consistent with the testimony of Ms. Armstrong, J.R.'s guardian ad litem, who noted that J.R. had been at her "best level of functioning" over the previous year and one-half. (Jan. 10, 2017 Tr. at 82.)

{¶ 45} The trial court also made the following observation: "[a]lthough mother has apparently worked hard on her mental health stability, there [are] still significant concerns raised by the most recent psychological evaluations as to her ability to maintain this stability so as to adequately care for and provide her children with a stable and permanent home." (Decision at 13-14.) These concerns were testified to by Ms. Armstrong, both caseworkers, the guardian ad litem for the children, and Dr. Pawlarczyk.

(Jan. 9, 2017 Tr. at 72, 186, 210; Jan. 10, 2017 Tr. at 16, 83.) The trial court expressed concern over J.R.'s "mental health state [to] be triggered by stress," as well as her continued use of marijuana even though it "directly affects her psychotic state." (Decision at 14.) The testimony of J.R. supports both observations. (Jan. 9, 2017 Tr. at 38, 40-41.)

{¶ 46} Based on the foregoing, the trial court concluded that returning the children to J.R. would "place them at serious risk of harm and/or deny them permanent stable housing." (Decision at 14.) Although J.R. testified that she would "never put [the children] in any danger or any harm," the testimony of almost all other witnesses supports the trial court's conclusion. (Jan. 9, 2017 Tr. at 56.) Ms. Davala described multiple supervised visits during which J.R.'s inability to parent effectively caused safety risks to the children. (Tr. at 75-103.) Dr. Pawlarczyk was concerned with J.R.'s ability to effectively parent, based on his observations of her with the children, and the effect of her mental health problems on the children. (Tr. at 186-87.) The children's guardian ad litem could not "safely recommend return" of the children. (Tr. at 225.) Nor could Ms. Manning. (Jan. 10, 2017 Tr. at 16.) The foregoing testimony constitutes competent, credible evidence supporting the trial court's determination that returning the children to J.R. would both place them at risk of harm and deprive them of legally secure permanent placement.

{¶ 47} The trial court also considered the biological father's abandonment of E.R. and S.L.J. under R.C. 2151.414(E)(10), as permitted by R.C. 2151.414(D)(1)(e). Both Ms. Davala and Ms. Manning testified regarding this fact. (Jan. 9, 2017 Tr. at 124-25; Jan. 10, 2017 Tr. at 14.) Finally, the trial court considered recommendations of the guardian ad litem and the case workers as a "relevant factor," as generally permitted by R.C. 2151.414(D)(1). The record reflects that Ms. Davala, Ms. Flowers, and Ms. Manning all recommended that the trial court grant the motion for permanent custody. (Jan. 9, 2017 Tr. at 127, 207; Jan. 10, 2017 Tr. at 16.)

{¶ 48} There was no indication in the record or in the trial court's decision that any testimony that the trial court relied on when considering the R.C. 2151.414 factors was offered by a witness who lacked competence or credibility. Thus, based on our review of the record developed in the trial court, there was competent, credible evidence to support all the statutory factors that it considered when concluding that granting the motions for

permanent custody would be in the best interests of E.R. and S.L.J. Accordingly, the trial court's decision was not against the manifest weight of the evidence.

### B. J.R.'s Arguments

{¶ 49} We now turn to the arguments that J.R. has made in this appeal. First, citing *In re Brown*, 60 Ohio App.3d 136 (1st Dist.1989) and *In re Bibb*, 70 Ohio App.2d 117 (1st Dist.1980), she argues that mental illness alone, without any additional evidence showing that it adversely affects a person's ability to parent, is insufficient to support a finding of dependency. (Appellant's Brief at 10-18.) J.R. asserts that "[t]here was no showing in this case that [her] emotional or mental infirmities adversely affected her ability to parent." (Appellant's Brief at 12.) She points to the testimony of her guardian ad litem concerning her improved mental condition, compliance with treatment, and failure of FCCS to ever allow the children to visit with her in her home instead of the "artificial" environment of the supervised visits. (Appellant's Brief at 17-19.)

{¶ 50} This court is without the power to reexamine the trial court's dependency adjudication. The statute is clear: "The adjudication that the child is an abused, neglected, or dependent child and any dispositional order that has been issued in the case under section 2151.353 of the Revised Code pursuant to the adjudication *shall not be readjudicated* at the hearing" on a motion for permanent custody. (Emphasis added.) R.C. 2151.414(A)(1). A trial court's adjudication of dependency is a final appealable order. *In re Murray*, 52 Ohio St.3d 155 (1990), syllabus. Furthermore, the Supreme Court of Ohio has expressly held that there is no exception to the 30-day time limit for filing an appeal under App.R. 4 of an adjudication of abuse, dependency, or neglect to allow the matter to be re-litigated if an agency subsequently seeks permanent custody of a child. *In re H.F.*, 120 Ohio St.3d 499, 504, 2008-Ohio-6810, ¶ 15. In this case, J.R. did not appeal the dependency adjudications of E.R. or J.L.R. The issue of their dependency adjudications is settled and she may not relitigate those determinations in this appeal.

{¶ 51} Second, J.R. argues that the trial court erred when it even considered FCCS' motions for permanent custody because R.C. 2151.413(D)(3)(B) prohibits an agency from filing such a motion if it has not made "reasonable efforts" at reunification. (Appellant's Brief at 19-23.) She asserts that FCCS never gave her the opportunity to comply with the case plan, and that the case worker, whether through ignorance or bias of mental health

issues, placed undue emphasis on those problems without actually demonstrating that they negatively affected her ability to parent the children. (Appellant's Brief at 24-28.)

{¶ 52}  Under R.C. 2151.413, "if a child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, the agency with custody shall file a motion requesting permanent custody of the child." R.C. 2151.413(D)(1). The statute also defines several circumstances when an agency may not file such a motion. R.C. 2151.413(D)(3). Under R.C. 2151.413(D)(3)(b), an agency may not file for permanent custody "[i]f reasonable efforts to return the child to the child's home are required under section 2151.419 of the Revised Code, [and] the agency has not provided the services required by the case plan to the parents of the child or the child to ensure the safe return of the child to the child's home." R.C. 2151.419(A)(1) states that an agency most prove that it has made "reasonable efforts to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home" at a hearing where "the court removes a child from the child's home or continues the removal of a child from the child's home" pursuant to statutory authorization.

{¶ 53} However, the "reasonable efforts" requirement under "R.C. 2151.419(A)(1) does not apply in a hearing on a motion for permanent custody filed pursuant to R.C. 2151.413." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 43. This is because a child support agency must have proven reasonable efforts prior to filing a motion for permanent custody. *Id.* "If the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *Id.* Thus, if the record reflects that the trial court has made a finding that the children services agency has made reasonable efforts as required by R.C. 2151.419(A)(1), the R.C. 2151.413(D)(3)(b) prohibition on filing a motion for permanent custody does not apply. *See In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 40 (overruling parents' assignment of error asserting that the trial court had failed to determine whether the agency had made reasonable efforts to reunify the family where the record reflected such findings made prior to the permanent custody proceedings).

{¶ 54} Here, the magistrate filed decisions on March 2, 2015 for E.R. and S.L.J., memorializing findings from a February 23, 2015 hearing extending temporary custody of the children. Both decisions included the following finding: "Reasonable efforts have been made to finalize the permanency plan in effect for the child." At that time, the permanency goal for both children was reunification, pursuant to the case plan in effect. (Dec. 20, 2013 Case Plan at 1; Feb. 27, 2015 Case Plan at 1; Feb. 24, 2015 Semiannual Administrative Review at 1.) No objections were made to the magistrate's decision. These findings satisfy the reasonable efforts requirement under R.C. 2151.419(A)(1). *In re K.L.* at ¶ 40. Accordingly, the R.C. 2151.413(D)(3)(b) prohibition did not apply, and FCCS appropriately filed the motions for permanent custody a month later. (Apr. 24, 2015 Mots. for Permanent Custody.)

{¶ 55} In addition, although under *In re C.F.,* the trial court was not required to address the issue of reasonable efforts when considering the agency's request for permanent custody, it did make such a finding. (Jan. 27, 2017 Decision at 4.) This determination was not against the manifest weight of the evidence, based on our review of the record. Contrary to J.R.'s assertion, FCCS did assist her in implementing the goals of the case plan. Ms. Davala testified that she "provided [J.R.] with bus passes and encouraged her to comply" with her mental health provider. (Jan. 9, 2017 Tr. at 84.) Ms. Davala "encouraged" J.R. to attend a parenting group, "to complete drug screening and work with her parent-mentor." (Tr. at 96.) On more than one occasion, Ms. Davala gave J.R. "a to-do list reminding her of her case services." (Tr. at 99, 111.) Ms. Manning referred J.R. to a third parenting class, which J.R. refused to attend, as well as drug screens. (Jan. 10, 2017 Tr. at 21, 28.)

{¶ 56} We find no support in the record for J.R.'s assertion that Ms. Davala was "unduly influenced by the mental health issues," to the extent that her recommendations to the trial court were informed solely by them. (Appellant's Brief at 26.) In fact, all of Ms. Davala's concerns regarding the children's safety arose from J.R.'s behavior during the visits she supervised with the children. The underlying cause of that behavior may have been J.R.'s schizophrenia, but Ms. Davala gave multiple reasons for recommending that the trial court grant the motion for permanent custody, including drug abuse and the inability to parent.

{¶ 57}  Ultimately, the issue before the trial court was not J.R.'s ability to comply with the elements of the case plan. The issue was whether terminating J.R.'s parental rights and granting permanent custody of E.R. and S.L.J. to FCCS was in their best interests. R.C. 2151.414(A)(1). The trial court acknowledged that J.R. had "apparently worked hard on her mental health stability," and had "recently demonstrated some mental health stability." (Jan. 27, 2017 Decision at 13-14.) However, the unfortunate reality is that, although J.R. complied with many aspects of the case plan, she did not demonstrate the behavioral stability or effective parenting skills that would have allowed the trial court to find that returning the children to her custody was in their best interests. The record suggests that, in spite of her efforts, J.R.'s untreated mental health problems did not permit her to attain the stability and parenting skills she needed to meet the best interests of the children. Her inability to achieve these goals was certainly not attributable to any moral failing on her part.

## IV. CONCLUSION

{¶ 58}  The trial court found clear and convincing evidence requiring it to grant the motion for permanent custody, divesting J.R. of her parental rights. For the reasons discussed, we conclude that competent, credible evidence supported this determination. Accordingly, we overrule the assignments of error in both appeals and affirm the judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgments affirmed.*

TYACK, P.J. and BRUNNER, J., concur.

————————————