[Cite as *In re S.T.*, 2019-Ohio-4341.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the matter of: [S.T.], | : | |
| [D.M., | : | No. 19AP-24 |
| | | (C.P.C. No. 16JU-12503) |
| Appellant]. | : | (REGULAR CALENDAR) |

D E C I S I O N

Rendered on October 24, 2019

**On brief:** *Robert J. McClaren,* for appellee Franklin County Children Services*.*

**On brief:** *Yeura R. Venters*, Public Defender, and *George M. Schumann*, for appellant D.M.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations and Juvenile Branch

LUPER SCHUSTER, J.

{¶ 1} Appellant, D.M., biological father of S.T., appeals from the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations and Juvenile Branch, terminating his parental rights and placing S.T. in the permanent custody of appellee, Franklin County Children Services ("FCCS"). For the following reasons, we affirm.

**I. Facts and Procedural History**

{¶ 2} S.T. was born on October 18, 2016. Two days later, FCCS filed a complaint alleging S.T. was a dependent minor child and seeking a temporary custody order pursuant to R.C. 2151.353. The complaint identified Da.M. as the mother and the father as unknown. The complaint alleged, inter alia, that mother was homeless, lacked supplies to care for S.T., and was living in a van with D.M. The trial court granted the request and entered a temporary custody order. The next day, the trial court continued the temporary order of

custody of S.T. to FCCS, and ordered "no contact with [D.M.]." (Oct. 21, 2016 Order at 3.) FCCS initially placed S.T. in foster care for approximately two months, and then FCCS placed her for the duration of the proceedings in the home of mother's maternal cousin.

{¶ 3} In January 2017, and after the trial court held a hearing attended by no parent, the trial court adjudicated S.T. to be a dependent child under R.C. 2151.04(C), continued the order of temporary custody with FCCS, and adopted a case plan that provided for supervised visits by mother and no visitation for the unknown father. In May 2017, D.M. filed a motion requesting the no contact order be lifted and that he be granted parenting time with S.T. On June 23, 2017, FCCS moved to amend the case plan to add services for and activities required of "putative father" D.M. On that date, FCCS also filed its first motion for permanent custody of S.T. In July 2017, the trial court appointed separate counsel for mother and D.M. The trial court also amended the case plan, giving D.M. visitation time with S.T., and ordering D.M. to complete DNA testing to establish his paternity of S.T.

{¶ 4} On January 29, 2018, the trial court held an annual review and pretrial hearing. At that hearing, D.M. testified that he is S.T.'s father and that he took a DNA test, the results of which showed he is the father. The trial court orally stated its determination that D.M. is S.T.'s father. On the same day, the trial court filed an entry stating that D.M. is S.T.'s biological father and ordering that his name be added to the child's birth certificate.

{¶ 5} On February 20, 2018, FCCS filed its second motion for permanent custody of S.T. FCCS's request for permanent custody was heard before the trial court in October and November 2018.[1] As pertinent to this appeal, the following evidence was adduced at the trial on the motion.

{¶ 6} D.M., S.T.'s biological father, testified as follows. Before mother was pregnant with S.T., D.M. went to jail for "putting [his] hands on her." (Oct. 17, 2018 Tr. at 38.) He and mother married each other in March 2017, approximately five months after S.T. was born. When S.T. was born, D.M. was homeless and living in a van parked in front of an apartment building. D.M. had no contact with S.T. from the time she left the hospital

---

[1] Before the start of the trial, FCCS withdrew its June 23, 2017 motion for permanent custody, and the matter therefore proceeded on FCCS's February 20, 2018 motion for permanent custody.

until May 2017. In September 2017, mother left D.M. to reside at "CHOICES," a domestic violence shelter. Mother told D.M. where she was, and D.M. arrived at the shelter to deliver some of her stuff. Mother was pregnant at the time of trial and would split her time residing with D.M. and her mother. D.M. is not employed but receives government assistance and has not been homeless since soon after S.T. was born. Although D.M. testified that he is S.T.'s biological father, he would not stipulate to the admissibility of the DNA test results showing him to be the biological father.

{¶ 7} Mother testified as follows. She and S.T.'s father, D.M., were homeless at the time S.T. was born. In the past, including when she was pregnant with S.T., mother had sold sex for money and D.M. was aware of this illicit activity. She testified that she and D.M. have anger problems and that D.M. had been physically and verbally abusive toward her. In September 2017, mother went to CHOICES, a shelter for victims of domestic abuse. After residing at the shelter for a couple months, mother was removed because she informed D.M. of her location and he arrived at the shelter. D.M. continued to be abusive toward mother, even when she was pregnant again after S.T.'s birth.

{¶ 8} Mother's sister, A.B., testified regarding mother and D.M.'s relationship. In the fall of 2017, A.B. had to go to a local Walmart because there was a domestic disturbance between her sister and D.M. Mother had a bruise on her cheek that she told A.B. was inflicted by D.M. A.B. testified that D.M. has "pimped out girls." (Oct. 17, 2018 Tr. at 159.) While at the hospital when S.T. was born, D.M. made statements that led A.B. to believe that he was seeking to find out when mother could be back available for prostitution. A.B. also testified that based on her observations, S.T. is "extremely happy" at her kinship placement, which she described as a "very stable, good, happy home." (Oct. 17, 2018 Tr. at 143, 148.) She viewed mother and D.M.'s home life as unstable.

{¶ 9} R.B., A.B.'s husband and mother's brother-in-law, also testified that mother had a bruise on her cheek when they picked her up after the Walmart confrontation. Mother had stated that D.M. hit her in the face. R.B. also recalled a time when he had called D.M. in an attempt to contact mother, and D.M. returned the call with a voicemail in which he instructed R.B. not to call him unless he was "trying to find him to contact me with a female." (Oct. 17, 2018 Tr. at 173.) R.B. described S.T. as a "very beautiful, happy girl" that "just adores the family she's with." (Oct. 17, 2018 Tr. at 175.)

{¶ 10} Dr. Tawny Tanner, a forensic psychologist, evaluated both mother and D.M. at the request of FCCS. Dr. Tanner determined that mother reported a history of mental and physical abuse from family and domestic violence and prostitution in her marriage to D.M. She determined mother's IQ score to be 62, which is in the extremely low range. This determination led Dr. Tanner to diagnose mother as having a mild-intellectual disability. She also diagnosed mother with "unspecified trauma and stressor related disorder." (Oct. 17, 2018 Tr. at 213.) Mother indicated to Dr. Tanner that D.M. had acted as her pimp and that he had occasionally hit her, but denied he was currently engaging in this conduct. Dr. Tanner recommended mother receive stress-management counseling, domestic violence support, and simplified parenting classes with a parent mentor. Based on the evaluation of D.M., Dr. Tanner determined his IQ to be 72, which is in the borderline low range. She diagnosed D.M. with having some traits of an anti-social personality disorder. She recommended D.M. participate in simplified parenting classes with a parent mentor and a domestic violence course to help with his anger management and interpersonal communications.

{¶ 11} FCCS caseworker Kelly Pruitt was assigned to S.T.'s case soon after the child was placed in FCCS's custody. She testified that mother and D.M. first came to her on May 22, 2017, just over seven months after S.T. was born, seeking to have the child go home with them. When Pruitt asked mother and D.M. where they had been, they responded that "they had been busy," without providing any details. (Oct. 18. 2018 Tr. at 34.) As part of the case plan, mother was required to complete parenting classes and a domestic violence assessment, and then to follow any recommendations based on that assessment. Mother completed most but not all of the recommended 12 parenting classes. She also completed an intake domestic violence assessment at the CHOICES domestic violence shelter but was terminated early from the shelter because D.M. arrived there on two occasions. She made no progress on the domestic violence component of the case plan after she left the CHOICES shelter. Even though it was recommended that mother discontinue any relationship with D.M., they continued to be together. Pruitt never witnessed physical violence between mother and D.M., but she frequently observed mother speak in a "loud, raised, angry voice towards" D.M. during their supervised visits with the child. (Oct. 18. 2018 Tr. at 23.) "She'll swear at him; she'll call him names." (Oct. 18. 2018 Tr. at 23.) This

verbal abuse concerned Pruitt, especially because it occurred in front of S.T. Pruitt further testified that D.M. completed some of the objectives of the case plan, such as completing the genetic testing, participating in group therapy for domestic violence perpetrators, and providing a source of income. While he attended most of the parenting classes with mother, he was only there as a support person, not as the actual client. The DNA testing demonstrated a 99.99 percent chance that D.M. is S.T.'s father.

{¶ 12} Generally, Pruitt observed a lack of bonding between mother and S.T. as evidenced by the child pulling away from mother, crying when mother picked her up, and sometimes not wanting to sit in mother's lap. Pruitt also observed the absence of a strong bond between D.M. and S.T. during the supervised visits. Pruitt indicated that S.T. would cry extensively at every supervised visit with mother and D.M. Sometimes mother and D.M. were able to soothe the child, but generally the child would stop crying when they released her from their grasp. Pruitt observed mother not interact with S.T. for an hour or more during supervised visits, "other than to push away" the child's hand "angrily." (Oct. 18. 2018 Tr. at 45.) In contrast, Pruitt testified that S.T. showed a strong bond with the kinship caregivers, and their own four children. Pruitt identified this home as a prospective adoptive home. Based on the circumstances, Pruitt recommended against reunifying S.T. with mother and D.M. and expressed her belief that it was in S.T.'s best interest for FCCS to be granted permanent custody.

{¶ 13} S.T.'s guardian ad litem, Richard Furnish, also recommended granting the permanent custody motion. Furnish testified that he had observed S.T. in her kinship placement and at the supervised visits with mother and D.M. He stated that S.T. was "very well bonded with the placement family," and was "comfortable, safe and healthy" in that placement. (Oct. 18. 2018 Tr. at 162.) Conversely, he expressed concerns regarding mother and D.M. based on the evidence of domestic violence, prostitution, and his view that they lacked adequate parenting skills and residential stability. For example, Furnish noted mother left a dirty diaper on the floor where S.T. was playing, D.M. spanked S.T. for no apparent reason, and mother and D.M. gave an ordinary bottled water to S.T. despite her very young age and the choking risk it posed to her. Based on his evaluation of the circumstances, Furnish testified that granting permanent custody to FCCS was in S.T.'s best interest.

{¶ 14} Following the trial, the court issued a written decision granting FCCS's motion for permanent custody of S.T. The trial court considered each of the factors in R.C. 2151.414(D) and determined there was clear and convincing evidence that it was in S.T.'s best interest to grant the motion for permanent custody.

{¶ 15} D.M. timely appeals.

## II. Assignment of Error

{¶ 16} D.M. assigns the following error for our review:

> The juvenile court's judgment granting permanent court commitment of the minor child to Franklin County Children Services is against the manifest weight of evidence.

## III. Standard of Review

{¶ 17} "In reviewing a judgment granting permanent custody to FCCS, an appellate court 'must make every reasonable presumption in favor of the judgment and the trial court's findings of facts.' " *In re J.T.*, 10th Dist. No. 11AP-1056, 2012-Ohio-2818, ¶ 8, quoting *In re P.G.*, 10th Dist. No. 11AP-574, 2012-Ohio-469, ¶ 37. " '[I]f the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment.' " *In re Brooks*, 10th Dist. No. 04AP-164, 2004-Ohio-3887, ¶ 59, quoting *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19 (1988). "Judgments are not against the manifest weight of the evidence when all material elements are supported by competent, credible evidence." *J.T.* at ¶ 8.

## IV. Discussion

{¶ 18} In D.M.'s sole assignment of error, he asserts the trial court's decision to grant permanent custody of S.T. to FCCS was against the manifest weight of the evidence. This assignment of error lacks merit.

{¶ 19} "Parents have a constitutionally-protected fundamental interest in the care, custody, and management of their children." *In re H.D.*, 10th Dist. No. 13AP-707, 2014-Ohio-228, ¶ 10, citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000). The Supreme Court of Ohio recognizes the essential and basic rights of a parent to raise his or her child. *In re Murray*, 52 Ohio St.3d 155, 157 (1990). However, these rights are not absolute, and a parent's natural rights are subject to the ultimate welfare of the child. *In re Cunningham*,

59 Ohio St.2d 100, 106 (1979). In certain circumstances, therefore, the state may terminate the parental rights of natural parents when such termination is in the best interest of the child. *H.D.* at ¶ 10, citing *In re E.G.*, 10th Dist. No. 07AP-26, 2007-Ohio-3658, ¶ 8, citing *In re Harmon*, 4th Dist. No. 00 CA 2694 (Sept. 25, 2000); *In re Wise*, 96 Ohio App.3d 619, 624 (9th Dist.1994).

{¶ 20} In deciding to award permanent custody, the trial court must take a two-step approach. *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 18. The court must first determine if any of the factors set forth in R.C. 2151.414(B)(1) apply. *Id.* The fourth factor described in R.C. 2151.414(B)(1) is that "[t]he child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period." R.C. 2151.414(B)(1)(d). Here, there is no dispute that S.T. was in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period. Thus, the statutory factor in R.C. 2151.414(B)(1)(d) was established.

{¶ 21} Once the trial court determines that one of the circumstances in R.C. 2151.414(B)(1) applies, it must then determine whether "clear and convincing" evidence demonstrates that a grant of permanent custody is in the child's best interest. *In re A.J.*, 10th Dist. No. 13AP-864, 2014-Ohio-2734, ¶ 16; R.C. 2151.414(B)(1). "Clear and convincing evidence is that degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the facts to be established." *K.L.* at ¶ 14. "It is more than a mere preponderance of the evidence but does not require proof beyond a reasonable doubt." *Id.*

{¶ 22} In determining the best interest of a child, R.C. 2151.414(D)(1) requires the trial court to consider all relevant factors including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public

children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in [R.C. 2151.413(D)(1)], the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in [R.C. 2151.414(E)(7) to (11)] apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e). R.C. 2151.414(D) does not give any one factor "greater relevance than the others." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56.

{¶ 23} D.M. generally contends the trial court erred in concluding the granting of permanent custody and termination of his parental rights was in S.T.'s best interest. He argues the trial court improperly diminished his status as S.T.'s father by identifying him as S.T.'s alleged biological father in the January 2019 judgment entry granting permanent custody of the child to FCCS, even though the court had already declared him to be the child's biological father in an entry filed a year earlier. According to D.M., the trial court diminished his legal standing in its evaluation of the child's best interest.

{¶ 24} For unknown reasons, D.M. would not stipulate to the DNA test results introduced at trial demonstrating that he is the child's biological father, even though he testified, at both the pretrial hearing and trial, that he is in fact S.T.'s biological father. At the pretrial hearing, the trial court stated its determination that D.M. is S.T.'s father, and it filed an entry identifying D.M. as S.T.'s biological father and ordering his name to be added to the child's birth certificate. Additionally, FCCS caseworker Pruitt testified at trial that DNA testing demonstrated a 99.99 percent chance that D.M. is S.T.'s biological father. Even so, the trial court's decision granting permanent custody to FCCS referred to D.M. as the alleged biological father. Regardless, the trial court treated D.M. as a party in the matter, and D.M. fails to show that the trial court's designation of him as the alleged biological father, instead of the biological father, affected its analysis of whether granting

permanent custody to FCCS was in the child's best interest. The focus of the best interest determination is upon the child, not the parent, as R.C. 2151.414(C) specifically prohibits the court from considering the effect a grant of permanent custody would have upon the parents. *In re K.M.*, 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 19. Therefore, we reject D.M.'s contention that the trial court's reference to him as the alleged biological father demonstrated reversible error.

{¶ 25} D.M. also argues the FCCS's reunification efforts were deficient because FCCS did not provide a parent mentor as recommended and it never attempted any visits in his home. "[E]xcept for a few narrowly defined exceptions, the state must have made reasonable efforts to reunify the family prior to the termination of parental rights." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 21. However, the "court shall not deny an agency's motion for permanent custody solely because the agency failed to implement any particular aspect of the child's case plan." R.C. 2151.414(C). Thus, the fact that no parent mentor was provided did not render the reunification effort unreasonable. The FCCS caseworker testified that no parent mentor had been assigned because the parenting classes had not been completed and visits with S.T. at the parents' home were not scheduled as the case had not successfully proceeded to that step. Therefore, we reject D.M.'s argument concerning FCCS's reunification efforts.

{¶ 26} D.M. additionally argues that because he substantially complied with his case plan, including making dozens of visits with S.T., the trial court should have given his efforts more weight in its best interest analysis. "R.C. 2151.414(D) does not require courts to deny a children services agency's motion for permanent custody solely by virtue of a parent's substantial compliance with the case plan." *In re Brooks* at ¶ 62. Thus, it was within the discretion of the trial court, as part of its best interest analysis, to decide the weight to give evidence of D.M.'s compliance with the case plan. Relatedly, D.M. contends the trial court's decision was against the manifest weight of the evidence, suggesting in part that the trial court's factual findings regarding mother's history of prostitution, and his involvement in that conduct, was not supported by the evidence. We also reject this more general argument. As set forth below, the evidence at trial supported the trial court's determination that granting permanent custody to FCCS was in the child's best interest.

{¶ 27} Under R.C. 2151.414(D)(1)(a), in making its best interest determination, the court must consider the interactions and relationships between the child and the individuals in the child's life, including the child's parents, siblings, relatives, and "any other person who may significantly affect the child." Here, the trial court found that neither mother nor D.M. established a significant bond with S.T., and that S.T. had developed a strong bond with her kinship (family) placement. The evidence supported these findings. Mother's sister, A.B., and her brother-in-law, R.B., testified that S.T. was very happy at her temporary custody placement. S.T.'s guardian ad litem, Furnish, and FCCS caseworker Pruitt also testified that S.T. had a strong bond with the kinship caregivers and their own four children. Pruitt expressed her view that this home would be a good adoptive home for the child, and Furnish emphasized how S.T. was thriving in that home. Conversely, Pruitt and Furnish both observed the absence of a strong bond between either mother or D.M. and S.T. Pruitt detailed S.T.'s frequent and unusually extensive crying when around mother and D.M., and other behaviors that reflected a lack of meaningful connection between the child and the biological parents. Therefore, based on this evidence, the "interaction and relationship" factor weighed in favor of awarding permanent custody to FCCS.

{¶ 28} R.C. 2151.414(D)(1)(b) required the trial court to consider the wishes of the child, expressed either directly by the child or through the child's guardian ad litem. At two years old, S.T. was too young to express her wishes. However, her guardian ad litem, Furnish, recommended granting the permanent custody motion. As noted above, Furnish testified that S.T. had successfully bonded with the placement family and was thriving. Additionally, he expressed concerns regarding mother and D.M. based on the evidence of domestic violence, prostitution, and his view that they lacked adequate parenting skills and residential stability. In his opinion, granting permanent custody to FCCS was in S.T.'s best interest. In view of the guardian ad litem's recommendation, this factor weighed in favor of the trial court granting permanent custody to FCCS.

{¶ 29} R.C. 2151.414(D)(1)(c) required the court to consider the custodial history of the child. Here, S.T. had been continuously in the custody of FCCS since a few days after her birth in October 2016. Thus, as of the time of the trial, S.T. had been in the custody of a public children services agency for virtually her entire life. This factor weighed in favor of granting permanent custody.

{¶ 30} R.C. 2151.414(D)(1)(d) addresses the child's need for legally secure permanent placement and required the court to consider whether this can be achieved without a grant of permanent custody to the agency. *In re D.P.*, 10th Dist. No. 06AP-780, 2007-Ohio-1703, ¶ 16. Here, the trial court concluded that mother and D.M. were unable to meet S.T.'s needs and that legally secure permanent placement could not be achieved for S.T. without an order of permanent custody to FCCS. The evidence supported these conclusions.

{¶ 31} S.T.'s biological parents were homeless when she was born. While the evidence showed that mother and D.M. obtained housing after she was born, they made no effort to seek custody of the child for over seven months. Evidence also showed that mother engaged in prostitution during her pregnancy with S.T., and that D.M. was aware of that circumstance, or even acted as her pimp. Thus, contrary to D.M.'s assertion, evidence supported the trial court's finding that there was a history of prostitution in this matter. Further, the evidence of domestic violence between mother and D.M. was extensive. Mother testified that she and D.M. have anger issues and that D.M. had been physically and verbally abusive toward her. Mother had reported to a shelter for domestic violence victims in September 2017. She was forced to leave because she informed D.M. of the otherwise undisclosed location of the shelter. The caseworker testified that she witnessed numerous instances of mother being verbally abusive toward D.M. in the presence of the child. Moreover, the caseworker and S.T.'s guardian ad litem testified that, based on their observations at the supervised visits, D.M. and mother's parenting abilities were limited. Therefore, evidence in the record supported the trial court's findings that mother and D.M. could not meet the needs of S.T. and that a legally secure permanent placement could not be achieved for S.T. without an order of permanent custody to FCCS.

{¶ 32} Lastly, under R.C. 2151.414(D)(1)(e), the court was required to consider any applicable factors set forth in R.C. 2151.414(E)(7) through (11), which include: (1) whether the parent has been convicted of or pled guilty to various crimes; (2) whether the parent withheld medical treatment or food from the child; (3) whether the parent has placed the child at a substantial risk of harm due to alcohol or drugs; (4) whether the parent has abandoned the child; and (5) whether the parent has had parental rights terminated with

respect to a sibling of the child.  Here, the trial court found that no evidence was offered pertinent to the factors listed in this provision, and D.M. does not challenge that finding.

{¶ 33} In sum, the record demonstrates that the trial court thoroughly reviewed and weighed the evidence in relation to all factors relevant to determining whether granting permanent custody to FCCS was in S.T.'s best interest.  And competent, credible evidence supported the trial court's determinations as to each of those factors and its ultimate conclusion that granting permanent custody to FCCS was in the child's best interest.  Because the trial court's decision to grant permanent custody was not against the manifest weight of the evidence, we overrule D.M.'s sole assignment of error.

## V.  Disposition

{¶ 34} Having overruled D.M.'s sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations and Juvenile Branch.

*Judgment affirmed.*

KLATT, P.J., and BEATTY BLUNT, J., concur.

_____