[Cite as *In re E.S.*, 2021-Ohio-955.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the matter of: | : | |
| | | No. 20AP-194 |
| (E.S.) et al., | : | (C.P.C. No. 17JU-000057) |
| (D.S., | : | (REGULAR CALENDAR) |
| Appellant). | : | |

D E C I S I O N

Rendered on March 25, 2021

**On brief:** *Yeura Venters*, Public Defender, and *Robert D. Essex*, for appellant.

**On brief:** *Robert McClaren*, for Franklin County Children Services.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations and Juvenile Branch

LUPER SCHUSTER, J.

{¶ 1} Appellant, D.S. ("father"), appeals from a decision and judgment entry of the Franklin County Court of Common Pleas, Division of Domestic Relations and Juvenile Branch, terminating his parental rights and placing E.S. and D.S. in the permanent custody of appellee, Franklin County Children Services ("FCCS"). For the following reasons, we affirm.

**I. Facts and Procedural History**

{¶ 2} This case involves FCCS's request for permanent custody of E.S., born February 8, 2005, and D.S., born May 30, 2008. On January 4, 2017, FCCS filed a complaint alleging E.S. and D.S. to be neglected and dependent children. FCCS filed the complaint after receiving information that L.S., the children's mother, had been a heavy drug user for years, abusing crack, prescription pills, and heroin. The complaint stated that

mother would sell her food stamps to obtain drugs and would not provide any food at home for the children, leaving the children to go hungry. FCCS received reports that the children were often playing in the neighborhood unsupervised. Additionally, it was reported to FCCS that the children's home was "deplorable," noting that dirty dishes, dirty clothing, dog feces, and trash covered the floors. (Jan. 4, 2017 Compl. at 1.) The complaint stated that FCCS had been involved with the family on a voluntary protective services basis since July 2016 and that mother has not been completing the drug screens required as part of that involvement. The family also prohibited the FCCS caseworker from observing the upstairs of the home, informing FCCS that a relative was renting the rooms upstairs. Though mother and father are married, father's whereabouts were unknown at the time FCCS filed its complaint.

{¶ 3} On January 11, 2017, following a preliminary hearing, the trial court granted a temporary order of custody ("TOC") to FCCS. The trial court ordered mother to undergo an alcohol and drug assessment, complete random drug screens, participate in a drug treatment program, and follow the recommendations of the assessment visits with FCCS. Subsequently, at a February 15, 2017 hearing, the parties proceeded uncontested as to the dependency cause of action and the trial court dismissed the neglect cause of action. The trial court adjudicated the children dependent and converted the TOC to an order of temporary court custody ("TCC") to FCCS. Subsequently, the trial court approved and adopted a case plan for both mother and father.

{¶ 4} Prior to the scheduled annual review hearing, FCCS filed a motion on December 7, 2017 requesting that permanent court custody ("PCC") of E.S. and D.S. be granted to FCCS. Pursuant to the PCC motion, FCCS alleged, under R.C. 2151.414(B)(1)(a), that the children could not be placed with either mother or father within a reasonable time or should not be placed with mother or father. Additionally, FCCS alleged in the motion that mother and father had failed to substantially remedy the conditions that led to the children's removal. After several continuances, FCCS filed an updated motion for PCC additionally alleging, pursuant to R.C. 2151.413(D)(1), that E.S. and D.S. had been in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period.

{¶ 5} On October 28, 2019, the guardian ad litem for E.S. and D.S. filed a report detailing her work with the children. Ultimately, the guardian ad litem recommended that

it was in the best interest of the children to grant the motion for PCC and place the children in the permanent custody of FCCS.

{¶ 6} Following several more continuances, the trial court conducted a trial on the motion for PCC on November 4, 2019. Father did not contest the granting of the PCC motion as to E.S. but did contest the granting of the PCC motion as to D.S. Mother did not participate in the trial. At the time of the trial, E.S. was 14 years old and D.S. was 11 years old.

{¶ 7} During the trial, father testified as if on cross-examination that he has been married to mother since 2007. Father acknowledged he had a court ordered case plan that required him to complete drug screens, but he testified that he stopped completing those drug screens when FCCS stopped providing him bus passes. Additionally, father agreed that he stopped calling in for his drug screens in June 2017, which would not have required transportation, missing more than 600 call-ins. Father denied having any positive drug test results, denied having a drinking problem, and denied being an alcoholic. However, father agreed that he had not obtained alcohol or drug treatment or any alcohol or drug assessment since the case was opened.

{¶ 8} When asked why the children were placed in FCCS's custody, father blamed mother and testified that he was not involved in that decision because he was not living with mother even though the two are still married. Though father disagreed that the children were removed because of drug and alcohol concerns, father agreed that mother is addicted to heroin and that her drug abuse interfered with her ability to care for the children. Father indicated a general lack of knowledge of where his children were living or the conditions of their living situation at the time the children were placed in FCCS's custody. Father testified he had recently moved into new housing "a couple days" prior to the trial, testifying his new residence had three bedrooms and thus plenty of space for D.S. should he be returned to father's care. (Nov. 4, 2019 Tr. at 42.) However, father was unable to provide an address of his housing, stating he did not remember where he moved.

{¶ 9} Alejandria Scott, the FCCS caseworker assigned to the case, testified that mother admitted to using heroin and fentanyl. The caseworker testified she had the opportunity to observe father's residence, a one-bedroom apartment, as part of her involvement in the case, but she testified she was not aware of father's recently obtained

new housing. The caseworker described father's apartment as "severely crowded" with clutter, leaving no space for anyone to actually stay inside. (Tr. at 51.) When the caseworker talked to father about the expectations of the case plan, including him completing an alcohol and drug assessment, completing urine screens, parenting classes, and a mental health assessment, the caseworker testified that father told her he was not going to "do any of those things because he had adult children that he raised." (Tr. at 52.)

{¶ 10} The caseworker testified that the children have been in the custody of FCCS since January 2017 and are currently placed together in treatment foster care. Mother had not made any progress on any of her case plan objectives at the time of trial and her drug abuse was ongoing. Mother told the caseworker that she stays with father "on and off." (Tr. at 58.)

{¶ 11} Further, the caseworker testified that father had not made any progress on the drug screens or alcohol and other drug assessment portions of his case plan. While the caseworker has monthly contact with father, the caseworker testified that father would repeatedly inform her that would not be completing any of the required case plan activities because he has adult children. The caseworker said father would attend his scheduled visits with D.S. but that D.S. was not particularly engaged in the visits. The caseworker also testified that FCCS provided both father and mother with bus passes but stopped providing those passes when father and mother stopped completing any of their case plan activities.

{¶ 12} The caseworker testified she provided drug referral paperwork and information to father. Additionally, the caseworker said father did not provide her with verified income but instead directed her to get paystubs from his attorney. The caseworker also stated father did not maintain consistent telephone contact with her and has failed to keep his telephone number up-to-date with FCCS. Father's biggest barrier to reunification with D.S., pursuant to the caseworker's testimony, was his lack of effort toward completing the case plan activities. The caseworker testified that the issues requiring FCCS to get involved in January 2017 had not been resolved.

{¶ 13} In describing D.S.'s placement in his foster home, the caseworker testified that D.S. has special needs including behavioral issues and an individualized education plan at school to help manage his ADHD. The caseworker testified E.S. and D.S. as bonded "[t]o

an extent," but she said there is "a lack of bond" between father and D.S. (Tr. at 66, 67.) Occasionally, the caseworker noted, D.S. would end the hour-long visits with father early.

{¶ 14} Usherala Johnson, the guardian ad litem for E.S. and D.S., testified that the children are able to articulate their wishes. E.S. has consistently expressed a desire to be adopted, telling the guardian ad litem that she does not believe father loves her and she does not believe mother can take care of her. The guardian ad litem testified that D.S. has consistently expressed a desire to stay in his current foster placement if he were not able to return to father's care. Though D.S. previously was opposed to the idea of adoption, the guardian ad litem testified that just prior to trial he began expressing an interest in adoption if it were with his current foster parent. The guardian ad litem testified that D.S. has consistently expressed a desire to continue to be able to visit with father even if the court were to grant the motion for PCC, though D.S. understands that he may not be able to visit with father if father's parental rights are terminated.

{¶ 15} The guardian ad litem testified that mother never had much engagement in the case. Additionally, the guardian ad litem testified that father's residence was "not appropriate * * * for anyone to sleep in" because it was too cluttered and without room for a person to safely sleep. (Tr. at 108.) She testified father indicated that he planned to clean out his apartment to make it habitable and that she specifically instructed him that he would need to contact the FCCS caseworker to schedule a new walk-through, but father did not do so prior to the trial. The guardian ad litem testified she was not aware that father had moved from that one-bedroom apartment.

{¶ 16} Ultimately, the guardian ad litem testified it was her recommendation that it was in the best interest of both E.S. and D.S. for the trial court to grant the motion for PCC and place the children in the permanent custody of FCCS. Specifically as to D.S., the guardian ad litem testified that she did not believe D.S. could return to father's care without protective services in place but D.S. had already been in placement for two years and ten months. The guardian ad litem described D.S. as being "somewhat bonded" with father. (Tr. at 122.) The guardian ad litem noted father had not demonstrated an ability to maintain suitable housing and has not been compliant with the drug and alcohol portions of his case plan. The guardian ad litem described father as exhibiting a lack of motivation to accomplish whatever would need to be done in order to have D.S. returned to his care.

{¶ 17} Father also testified on direct examination, stating he and mother had been separated for the past seven years, and he denied that mother has lived with him or temporarily stayed with him since they separated. Father testified he had maintained the same job since 2005. Though father admitted to occasionally consuming alcohol, he denied that he drank alcohol every night. Additionally, father stated he recently moved into new housing so D.S. would have more space. On cross-examination, however, father stated he had not yet moved into the new housing but that he hoped to be able to soon, indicating that he still lived in the one-bedroom apartment that the guardian ad litem had deemed unsuitable. Father testified he did not notify the FCCS caseworker or the guardian ad litem that he had moved because there was a period of time where he did not have a telephone. He also denied knowledge of the case plan.

{¶ 18} The trial court conducted an in-camera interview with D.S. during which D.S. stated that he wanted to return to his parents' care, but if he could not do that, his preference was to stay in his current foster placement and continue to be able to visit with mother and father. D.S. stated he did not want to be adopted. D.S. also told the trial court that mother and father still live together.

{¶ 19} Following the trial, the trial court granted FCCS's motion for permanent custody of both E.S. and D.S. and terminated the parental rights of mother and father. The trial court considered the factors in R.C. 2151.414(D) and determined there was clear and convincing evidence that it was in E.S.'s and D.S.'s best interest to grant the motion for permanent custody. The trial court journalized its decision in a March 24, 2020 decision and judgment entry. Father timely appeals the grant of the PCC motion with respect to D.S. only.

## II. Assignment of Error

{¶ 20} Appellant assigns the following error for our review:

> The trial court committed reversible error by terminating the appellant-father's parental rights when the decision was against the manifest weight of the evidence.

## III. Analysis

{¶ 21} In his sole assignment of error, father argues the trial court erred in granting permanent custody of D.S. to FCCS. More specifically, father asserts the decision to grant the motion for PCC was against the manifest weight of the evidence.

{¶ 22} "In reviewing a judgment granting permanent custody to FCCS, an appellate court 'must make every reasonable presumption in favor of the judgment and the trial court's findings of facts.' " *In re J.T.*, 10th Dist. No. 11AP-1056, 2012-Ohio-2818, ¶ 8, quoting *In re P.G.*, 10th Dist. No. 11AP-574, 2012-Ohio-469, ¶ 37. " '[I]f the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment.' " *In re Brooks*, 10th Dist. No. 04AP-164, 2004-Ohio-3887, ¶ 59, quoting *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19 (1988).

{¶ 23} "Judgments are not against the manifest weight of the evidence when all material elements are supported by competent, credible evidence." *J.T.* at ¶ 8. "Pursuant to R.C. 2151.414(B)(1), a trial court may grant permanent custody if after a hearing it determines, by clear and convincing evidence, that * * * such relief is in the best interest of the child." *Id.* at ¶ 9. "Clear and convincing evidence is that degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the facts to be established." *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 14. "It is more than a mere preponderance of the evidence but does not require proof beyond a reasonable doubt." *Id.*

{¶ 24} "Parents have a constitutionally-protected fundamental interest in the care, custody, and management of their children." *In re H.D.*, 10th Dist. No. 13AP-707, 2014-Ohio-228, ¶ 10, citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000). The Supreme Court of Ohio recognizes the essential and basic rights of a parent to raise his or her child. *In re Murray*, 52 Ohio St.3d 155, 157 (1990). However, these rights are not absolute, and a parent's natural rights are subject to the ultimate welfare of the child. *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979). In certain circumstances, therefore, the state may terminate the parental rights of natural parents when such termination is in the best interest of the child. *H.D.* at ¶ 10, citing *In re E.G.*, 10th Dist. No. 07AP-26, 2007-Ohio-3658, ¶ 8.

{¶ 25} In deciding to award permanent custody, the trial court must take a two-step approach. *K.L.* at ¶ 18. The court must first determine if any of the factors set forth in R.C. 2151.414(B)(1) apply. *Id.* Here, there is no dispute that D.S. was in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period, satisfying R.C. 2151.414(B)(1)(d).

{¶ 26} Once the trial court determines that one of the circumstances in R.C. 2151.414(B)(1) applies, the trial court must then determine whether a grant of permanent custody is in the best interest of the child. *In re A.J.*, 10th Dist. No. 13AP-864, 2014-Ohio-2734, ¶ 16; R.C. 2151.414(B)(1). In determining the best interest of a child, R.C. 2151.414(D)(1) directs that the trial court must consider all relevant factors including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e).

{¶ 27} The trial court considered all of the above statutory factors with respect to D.S. and concluded that an award of permanent custody was in the best interest of the child. Father disagrees with the trial court's conclusions.

{¶ 28} Father's argument is not a challenge to any specific finding of the trial court under R.C. 2151.414(D)(1). Instead, much of father's argument represents an assertion that it was not his fault that the children were placed in FCCS's custody in the first instance. He blames mother for the conditions leading to the children's removal, and he asserts his general noncompliance with the case plan was not relevant to whether it was in D.S.'s best interest to be reunited with father. Even if this court were to construe father's cooperation with the visitation portion of his case plan and his consistently expressed desire to have D.S. returned to his care as some measure of substantial compliance with the case plan, we are mindful that " 'R.C. 2151.414(D) does not require courts to deny a children services agency's motion for permanent custody solely by virtue of a parent's substantial compliance with the case plan.' " *In re S.T.*, 10th Dist. No. 19AP-24, 2019-Ohio-4341, ¶ 26, quoting *In re Brooks* at ¶ 62. Thus, it was within the discretion of the trial court, as part of its best interest analysis, to decide the weight to give evidence of father's compliance with the case plan. As set forth below, the evidence at trial supported the trial court's determination that granting permanent custody to FCCS was in D.S.'s best interest.

{¶ 29} Under R.C. 2151.414(D)(1)(a), the trial court must, in making its best interest determination, consider the interactions and relationships between the child and the individuals in the child's life, including the child's parents, siblings, relatives, and "any other person who may significantly affect the child." Here, the trial court relied on the testimony of the caseworker to find that the visits between D.S. and father were superficial with minimal engagement. The trial court also found that D.S. is loyal and devoted to father and that E.S. and D.S. are bonded toward each other. Although father argues the trial court should have placed a greater emphasis on other testimony about his relationship with D.S., the evidence nonetheless supported these findings, including the testimony of the caseworker and the guardian ad litem.

{¶ 30} Next, R.C. 2151.414(D)(1)(b) required the trial court to consider the wishes of the child. The trial court noted that D.S. expressed during his in-camera interview a desire to be reunited with mother and father if possible and he did not wish to be adopted. The

trial court also noted the guardian ad litem's recommendation, even in light of D.S.'s expressed desires, that permanent custody to FCCS was in D.S.'s best interest.

{¶ 31} R.C. 2151.414(D)(1)(c) then requires the court to consider the custodial history of the child. D.S. had been continuously in the custody of FCCS for a total of 33 months.

{¶ 32} R.C. 2151.414(D)(1)(d) addresses the child's need for a legally secure placement and requires the court to consider whether this can be achieved without a grant of permanent custody to the agency. The trial court concluded that of father's five case plan objectives, the only objective he completed was the weekly visits with D.S. Despite having two years to substantially complete his case plan, father repeatedly told the caseworker he did not need to complete those objectives because he had already raised other adult children. Father completed only 68 of the possible 242 drug screens, 60 of which were positive for alcohol, marijuana, and/or abnormal creatine levels, and he had not completed any random drug screens in the 11 months immediately preceding the trial. Although father testified that he was separated from mother, the trial court relied on D.S.'s testimony from the in-camera interview to conclude that father and mother still live together and that mother, despite her ongoing drug abuse that led to the children's removal, has ready access to father's home. Thus, the trial court concluded father had not shown an ability to protect D.S. from harm or exposure to drug abuse.

{¶ 33} Additionally, the trial court found that the only housing that father had made available to survey by FCCS was not appropriate safe and stable housing, and both the caseworker and the guardian ad litem testified father's apartment was not suitable for habitation by D.S. or anyone. While father testified he had secured new housing just days before trial, he did not inform the caseworker, the guardian ad litem, or D.S.'s attorney of this new housing, and he was unable to provide any specific information about where the housing was located or when it might be ready for D.S. to live in it. Father demonstrated a lack of understanding of D.S.'s basic needs. All of this evidence, as well as the evidence regarding D.S.'s behavioral issues and educational needs, supports the trial court's finding that D.S. was in great need of a legally secure permanent placement to continue his physical, educational, emotional, and social development and that such a legally secure permanent placement could not be achieved without a grant of permanent custody to FCCS.

{¶ 34} Finally, R.C. 2151.414(D)(1)(e) requires the court to consider any applicable factors set forth in R.C. 2151.414(E)(7) through (11). The trial court noted there was clear and convincing evidence that father had another child committed to the permanent custody of FCCS, and father does not dispute that finding.

{¶ 35} Here, the record demonstrates the trial court thoroughly reviewed and weighed the evidence in relation to all factors relevant to determining whether granting permanent custody to FCCS was in D.S.'s best interest. Having reviewed the record, we find competent, credible evidence supported the trial court's determinations as to each of those factors and its ultimate conclusion that granting the motion for permanent custody to FCCS was in the child's best interest. Thus, because the trial court's decision to grant the motion for permanent custody and terminate father's parental rights was not against the manifest weight of the evidence, we overrule father's sole assignment of error.

## IV. Disposition

{¶ 36} Based on the foregoing reasons, the trial court's decision granting the motion for permanent custody was not against the manifest weight of the evidence. Having overruled father's sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations and Juvenile Branch.

*Judgment affirmed.*

BROWN and BROGAN, JJ., concur.

BROGAN, J., retired, formerly of the Second Appellate District, assigned to active duty under authority of the Ohio Constitution, Article IV, Section 6(C).