[Cite as *In re R.G.S.*, 2020-Ohio-6696.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| [R.G.S. | : | No. 20AP-101 |
| | | (C.P.C. No. 16JU-11130) |
| R.S., Father, | : | |
| | | (REGULAR CALENDAR) |
| Appellant]. | : | |
| In the Matter of: | : | |
| [R.G.S., | : | No. 20AP-102 |
| | | (C.P.C. No. 16JU-11130) |
| A.D., Mother, | : | |
| | | (REGULAR CALENDAR) |
| Appellant]. | : | |
| In the Matter of: | : | |
| [A.S., | : | No. 20AP-103 |
| | | (C.P.C. No. 16JU-11131) |
| A.D., Mother, | : | |
| | | (REGULAR CALENDAR) |
| Appellant]. | : | |

D E C I S I O N

Rendered on December 15, 2020

**On brief:** *Yeura R. Venters*, Public Defender, and *Ian J. Jones*, for appellant R.S., or Father.

**On brief:** *William T. Cramer*, for appellant A.D., or Mother.

**On brief:** *Robert J. McClaren*, for Franklin County Children Services.

APPEALS from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

DORRIAN, J.

{¶ 1} Appellants A.D. and R.S. appeal the February 5, 2020 decisions and judgment entries of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, which terminated their parental rights and granted permanent custody of the minor children, R.G.S. and A.S. (collectively, "the children"), to Franklin County Children Services ("FCCS").[1] For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} On September 16, 2016, FCCS filed a complaint asserting R.G.S., the child of A.D. and R.S., was a dependent child pursuant to R.C. 2151.04(C). On the same date, FCCS filed a separate complaint asserting A.S., the child of A.D. and J.S., was a neglected child pursuant to R.C. 2151.03(A)(2) and (3). On September 16, 2016, a magistrate appointed by the juvenile court filed emergency care orders granting FCCS emergency custody of the children.

{¶ 3} On September 19, 2016, the magistrate filed orders granting FCCS temporary custody of the children. On September 20, 2016, the magistrate filed findings of fact and conclusions of law finding that FCCS was unable to provide services prior to removal because "[m]other's whereabouts are not known and the current caregiver is unable to provide for the child." On September 22, 2016, the juvenile court appointed a guardian ad litem ("GAL") for the children. On October 26, 2016, the GAL filed reports and recommendations for the children.

{¶ 4} On December 1, 2016, FCCS filed a case plan for R.G.S. On December 5, 2016, the magistrate filed a decision and judgment entry finding R.G.S. to be a dependent child pursuant to R.C. 2151.04(C), adopting the case plan as an order of the court, and granting FCCS temporary custody of R.G.S. pursuant to R.C. 2151.353(A)(2). On December 6, 2016, FCCS filed a case plan for A.S. On December 6, 2016, the magistrate filed a decision and judgment entry finding A.S. to be a dependent child pursuant to R.C. 2151.04(C), adopting the case plan as an order of the court, and granting FCCS temporary custody of A.S. pursuant to R.C. 2151.353(A)(2).

---

[1] The parental rights of J.S., father of A.S., were also terminated by the trial court's February 5, 2020 decisions. J.S. did not contest the grant of permanent custody and has not appealed from those decisions.

{¶ 5} On March 16, 2017, FCCS filed semi-annual reviews. On August 14, 2017, FCCS filed motions for permanent custody of the children pursuant to R.C. 2151.413 and 2151.414. On September 1, 2017, FCCS filed semi-annual reviews. On October 18, 2017, the magistrate filed findings of fact and conclusions of law finding that FCCS made reasonable efforts to finalize a permanency plan for the children. On December 13, 2017 and July 6, 2018, the GAL filed reports and recommendations for the children. On February 15 and August 16, 2018, FCCS filed semi-annual reviews.

{¶ 6} On September 6, 2018, FCCS again filed motions for permanent custody of the children pursuant to R.C. 2151.413 and 2151.414. On October 11, 2018 and May 13, 2019, the GAL filed reports and recommendations for the children. On February 8 and October 9, 2019, FCCS filed semi-annual reviews. Beginning on October 1, 2019, the juvenile court held a hearing on the motions for permanent custody.

{¶ 7} At the hearing, A.D. testified she had not had custody of the children since late 2016 because she was on drugs and, as a result, was not able to provide for them at that time. Since 2016, A.D. had been required under her case plan to complete drug testing, take parenting classes, complete alcohol, drug, and mental health assessments, obtain housing, and maintain employment. A.D.'s caseworker provided A.D. with a copy of the case plan, referrals for case plan activities, and transportation via bus passes and taxi rides when she needed them.

{¶ 8} Beginning in January 2019 through the date of the hearing, A.D. participated in counseling for drug abuse at Brightview. A.D. admitted that a drug and alcohol assessment was included in her case plan because she was using drugs without a prescription at the time. At the time of the hearing, A.D. claimed to have not had alcohol for approximately one year. A.D. admitted that as of May 2019, she was only 40 percent compliant with Brightview's treatment program. A.D. was required to complete random drug screens through American Court Services ("ACS"). A.D. agreed she had missed over 150 of the random drug screens required by her case plan. A.D. received weekly, non-random drug screens at Brightview.

{¶ 9} In June 2019, A.D. and R.S. began renting a residence in London, Ohio. From April to June 2019, A.D. lived at her brother's residence. Before living with her brother, A.D. stayed for several months with someone in Frankfort, Ohio. Prior to that, A.D. stayed

with her stepfather and in several different residences in Columbus. A.D. stated that before she lived with her stepfather, she was "kinda (sic) here and there at that time." (Oct. 1, 2019 Tr. at 38-39.) The last time A.D. lived on her own was six years before the date of the hearing. When FCCS first received custody of the children in September 2016, A.D. was not working, on drugs, and staying with R.S. and several other people in Columbus. The children did not reside with A.D. or R.S. at the time FCCS received custody.

{¶ 10} A.D. acknowledged she was required to maintain employment under her case plan. For a little over a month prior to the hearing, A.D. had been employed at a factory. Prior to her current job, A.D. had worked at Menard's for approximately five months and a different factory for approximately one month. Prior to those jobs, A.D. had worked as a home health aide for six years, with some unemployment during that time, including when FCCS received custody of the children. At the time of the hearing, A.D. made $1,840 per month and R.S. made approximately $1,800 per month from disability.

{¶ 11} A.D. acknowledged she was required to complete a domestic violence assessment under her case plan, but had not done so. A.D. instead claimed her mental health assessment satisfied the requirement for a domestic violence assessment. When asked whether she had a history of domestic violence with R.S., A.D. replied that "there was [sic] a few times." (Oct. 1, 2019 Tr. at 50.) At the time of the hearing, A.D. was in a relationship with R.S.

{¶ 12} A.D. stated she completed parenting courses twice. A.D. had hour-long scheduled visits with the children every week. A.D. admitted she did not visit the children or otherwise contact them from December 10, 2017 until July 9, 2018. From April 28, 2019 until the permanent custody hearing on October 1, 2019, A.D. had missed six visits with the children. A.D. generally informed FCCS if she was going to miss a visit.

{¶ 13} The children had never been returned to A.D.'s custody since FCCS first obtained custody in September 2016. A.D. sought expanded visitation with the children, but her request had not been granted. A.D. stated that both she and R.S. would be able to care for the children. The children had been in the same foster home since November 2016. A.D. agreed the children were bonded with their foster parent and that the uncertainty of the custody situation had been difficult for the children.

{¶ 14} A.D. claimed to have stopped using drugs beginning in October 2017. A.D. had difficulty making it to drug screens. A.D. stated she received a negative result from a hair follicle drug screen in October 2018 and another negative result from a hair follicle drug screen in January 2019.

{¶ 15} R.S. testified at the hearing that he was the father of R.G.S. R.G.S. had not lived with R.S. from late 2015 until present. In October 2016, R.S. was hospitalized for a period of approximately seven months due to endocarditis resulting from four months of heroin usage. After being released from the hospital, R.S. was in rehabilitation in a nursing home until November 2017. R.S. relapsed in November 2017. R.S. did not visit the children from November 2017 until August 5, 2018.

{¶ 16} In 2018, R.S. was prescribed a monthly shot of Vivitrol at the Hopewell Health Center in Chillicothe, Ohio. R.S. did not regularly participate in counseling that was offered in conjunction with his Vivitrol prescription. R.S. claimed to have not used drugs after receiving Vivitrol. Even though R.S. did not attend counseling, he claimed that Hopewell Health Center considered him to have successfully completed the Vivitrol program because he remained drug-free for 11 months while receiving the shot.

{¶ 17} In December 2018, R.S. was rushed back to the hospital for a craniotomy due to an abscess in his brain. After R.S. was released from the hospital in April 2019, he made efforts to comply with his case plan requirements by securing housing and transportation.

{¶ 18} R.S. agreed that he was required under his case plan to complete random drug screens through ACS. On October 15, 2018, R.S. informed the juvenile court that he would be able to successfully complete drug screens at ACS in Columbus. In May 2019, R.S. began receiving treatment at Brightview and was currently in treatment as of the date of the hearing. When asked whether he began completing his required random drug screens through ACS in August 2019, R.S. responded, "Yeah, I'm not sure but I've been testing for Brightview as well." (Oct. 1, 2019 Tr. at 123.) R.S. had a prescription from Brightview for Buprenorphine, or Suboxone, and was testing positive for such medication.

{¶ 19} From February 2018 until his hospitalization in December 2018, R.S. lived with his brother. After he was released from the hospital in April 2019, he stayed with a friend. From June 2019 through the date of the hearing, R.S. rented a residence with A.D. in London, Ohio.

{¶ 20} At the time of the hearing, R.S. received $1,880 in monthly income from disability. In 2018, he completed a parenting class. R.S. participated in hour-long weekly visitation with the children at the same time as A.D. R.S. was unable to participate in visitations from November 2017 until August 5, 2018 because of his health issues and issues resulting from his brother's suicide. R.S. considered himself to be a parent to both children.

{¶ 21} Jennifer Taylor, the FCCS caseworker currently assigned to the family, testified she took over caseworker responsibilities from the prior caseworker, Lolita Jones, on July 15, 2019. When Taylor began working on the case, A.D. and R.S. had already received their case plan, understood their case plan requirements, and were linked with drug and alcohol treatment.

{¶ 22} Taylor testified FCCS received temporary custody of the children on September 16, 2016, followed by temporary court commitment on November 28, 2016. At the time the permanent custody motion was filed, the children had been in continuous FCCS custody for more than 12 out of 22 months. Furthermore, the children had been in the same foster home since November 2016, nearly 3 years before the permanent custody hearing.

{¶ 23} When FCCS obtained temporary court commitment of the children on November 28, 2016, a case plan for the family was filed and made an order of the court. The case plan provided both A.D. and R.S. with multiple objectives including but not limited to the following: (1) complete a drug and alcohol assessment and follow recommendations; (2) complete random screens to demonstrate sobriety; (3) complete parenting education classes; (4) complete a domestic violence assessment; (5) participate in visitation with the children; and (6) obtain a legal source of housing and income.

{¶ 24} Taylor testified A.D. had completed parenting classes and obtained a legal source of housing and income. A.D. had previously participated in drug and alcohol assessments through two organizations and began receiving drug and alcohol counseling at Brightview in January 2019. A.D. missed 188 of 213 random screens over the course of the case. Of those 25 screens which had been completed, 4 were positive and 21 were negative. A.D.'s most recent test was completed on September 26, 2019 and returned a negative result.

{¶ 25} R.S. had also completed parenting classes and obtained housing and income. R.S. began drug and alcohol treatment with Brightview in May 2019. R.S. had been referred to ACS for random screening throughout the history of the case but had only completed orientation and commenced testing in July or August 2019. Since August 2019, R.S. had completed four of the six random screens. In the four completed random screens, R.S. had tested positive for his prescribed Suboxone.

{¶ 26} Taylor testified that when A.D. and R.S. were present for weekly visitation, the visits went well. A.D. and R.S. visited together and brought food for the children. A.D. and R.S. played games with the children and discussed birthdays and holidays. From November 2016 until November 2017, A.D. and R.S. missed 14 visits. Between December 2017 and July 2018, a period of approximately eight months, neither A.D. nor R.S. visited the children. A.D. and R.S. resumed visiting the children in August 2018, and had missed 13 visits between that date and the permanent custody hearing on October 1, 2019. Taylor stated that R.S. was unable to visit due to health reasons from October 2016 through August 2017 and again from February through March 2019.

{¶ 27} Taylor recommended the court grant the motion for permanent custody because the children had been in foster care for nearly three years and needed to have closure. Taylor did not believe the children could be successfully reunited with A.D. and R.S. without family counseling to alleviate the children's fears and address issues resulting from witnessing A.D. and R.S. abusing drugs. Family counseling had not started at the time of the hearing because A.D. and R.S. had not completed enough random screens to demonstrate sobriety. Additionally, because A.D. and R.S. had only moved into their present residence in June 2019, there had not been sufficient time to demonstrate that they could maintain stable housing given their history.

{¶ 28} According to Taylor, the children appeared to be bonded to one another. The children were bonded to A.D., R.S., and their foster parent. The children's foster parent had established a routine with the children, made sure their emotional needs were met, nurtured them, and addressed any behavioral issues. The children were comfortable with their foster parent, with whom they laughed and played. The foster parent was a potential adoptive placement for the children.

{¶ 29}  Delilah Nunez testified she had served as the children's GAL throughout the case, beginning with her appointment on September 16, 2016.  According to Nunez, the foster parent's interaction with the children was very appropriate and nurturing.  The foster parent was able to have fun with the children and also serve as a disciplinarian.  Nunez had observed A.D. and R.S. with the children at court.  Nunez had observed A.D. visiting with the children at FCCS, but had not been able to observe R.S. with the children at FCCS because of his hospitalizations.  Less than two weeks before the permanent custody hearing, Nunez was invited to visit A.D. and R.S.'s new residence, but had not been able to visit prior to the hearing.

{¶ 30}  Nunez testified regarding the children's understanding of the proceedings and their preferences for placement.  A.S., who was 11 years old at the time of the permanent custody hearing, was competent to understand the proceedings according to Nunez.  A.S.'s preferences regarding placement had "changed in different ways" throughout several discussions over the course of the proceedings. (Oct. 2, 2019 Tr. at 69.)  At the time of the permanent custody hearing, A.S. wished to be adopted by the foster parent. R.G.S., who was 7 years old at the time of the permanent custody hearing, was also competent to understand the proceedings according to Nunez.  R.G.S.'s preferences for placement had changed over the course of the proceedings, but her preference at the time of the hearing was to be placed with A.D. and R.S.

{¶ 31}  Nunez recommended the juvenile court grant the motion for permanent custody because of the need of the children to receive closure and finality due to the long duration of the case.  Nunez had concerns about how long it took A.D. and R.S. to make progress on the case plan.  According to Nunez, A.D. and R.S. had not completed their work on the case plan because there had not been a pattern of completed, clean random screens.  Nunez noted that the case history included concerns related to A.S. witnessing domestic violence between A.D. and R.S.  Finally, as a result of the support and involvement of the foster parent, the children had increased their attendance at school and made academic progress.

{¶ 32}  On October 22, 2019, the children's GAL filed reports and recommendations.  On February 5, 2020, the juvenile court filed two decisions and judgment entries, granting permanent custody of both children to FCCS.  On March 30, 2020, the juvenile court filed

judgment entries correcting, pursuant to Civ.R. 60(A), its February 5, 2020 decisions and judgment entries.[2]

## II. Assignments of Error

{¶ 33} Appellants appeal and assign the following assignments of error for our review:

### A. R.S. Father

[I.] The trial court's permanent commitment of [R.G.S.] to the custody of FCCS was not supported by clear and convincing evidence and was against the manifest weight of the evidence that the commitment was in [R.G.S.]'s best interest as FCCS failed to make reasonable efforts toward [R.G.S.]'s reunification with Father.

[II.] Sufficient evidence was not presented to support the trial court's finding by clear and convincing evidence that granting permanent custody to FCCS was in [R.G.S.]'s best interest, as FCCS failed to make reasonable efforts toward [R.G.S.]'s reunification with Father.

### B. A.D. Mother

[I.] The juvenile court's decision that it is in the best interests of the children to grant permanent custody to the agency is not supported by clear and convincing evidence.

[II.] The trial court's finding that the agency made reasonable efforts toward reunification is not supported by clear and convincing evidence.

## III. Applicable Law

{¶ 34} "The right to parent one's child is a fundamental right protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 16, of the Ohio Constitution." *In re L.W.*, 10th Dist. No. 17AP-586, 2018-Ohio-2099, ¶ 6. *See also In re Murray*, 52 Ohio St.3d 155, 157 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) ("[T]he right to raise one's children is an 'essential' and 'basic civil right.' "). "Parents have a 'fundamental liberty interest' in the care, custody, and

---

[2] We note that these nunc pro tunc entries corrected the decisions to reflect the exhibits that were offered and admitted at trial.

management of the child."  *Id.*, quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). "Permanent termination of parental rights has been described as 'the family law equivalent of the death penalty in a criminal case.' Therefore, parents 'must be afforded every procedural and substantive protection the law allows.' " *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991).

{¶ 35}  However, the state has broad authority to intervene to protect children from abuse and neglect. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28, citing R.C. 2151.01. An award of permanent custody, which terminates parental rights, is an " 'alternative of last resort and is only justified when it is necessary for the welfare of the children.' " *In re C.G.*, 10th Dist. No. 13AP-632, 2014-Ohio-279, ¶ 28, quoting *In re Swisher*, 10th Dist. No. 02AP-1408, 2003-Ohio-5446, ¶ 26.

{¶ 36}  Pursuant to R.C. 2151.414(B)(1), a court may grant permanent custody of a child to a public children services agency if the court determines, by clear and convincing evidence, that: (1) it is in the best interests of the child, and (2) one of the factors set forth in R.C. 2151.414(B)(1) applies. "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. *See In re D.C.*, 10th Dist. No. 08AP-1010, 2009-Ohio-2145, ¶ 9, citing *In re Abram*, 10th Dist. No. 04AP-220, 2004-Ohio-5435 (finding it is not necessary for evidence to be "unequivocal" in order to meet the clear and convincing standard).

{¶ 37} In determining whether granting permanent custody to an agency is in the child's best interests, the court must consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e). The additional factors referenced by R.C. 2151.414(D)(1)(e) are:

(7) The parent has been convicted of or pleaded guilty to one of [a list of criminal offenses].

(8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.

(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.

(10) The parent has abandoned the child.

> (11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

R.C. 2151.414(E)(7) through (11).

{¶ 38} Moreover, in determining the best interests of the child, the court "shall not consider the effect the granting of permanent custody to the agency would have upon any parent of the child." R.C. 2151.414(C). *See In re V.B.-S.*, 10th Dist. No. 13AP-478, 2013-Ohio-5448, ¶ 36. Similarly, R.C. 2151.414(C) prohibits a court from "deny[ing] an agency's motion for permanent custody solely because the agency failed to implement any particular aspect of the child's case plan."

{¶ 39} In addition to determining whether it would be in a child's best interests to grant the motion for permanent custody, a court must consider the factors in R.C. 2151.414(B)(1). R.C. 2151.414(B)(1) provides that a court may grant a motion for permanent custody if, as relevant here, "[t]he child is abandoned" or "[t]he child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period." R.C. 2151.414(B)(1)(b) and (d).

**IV. Standard of Review**

{¶ 40} On appeal, we will not reverse a court's determination that it was in the best interests of the children to grant a motion for permanent custody unless such determination is against the manifest weight of the evidence. *L.W.* at ¶ 8. " 'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on [the evidence's] effect in inducing belief." ' " (Emphasis omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). *See C.G.* at ¶ 31. Thus, in reviewing a judgment under the manifest weight

standard, a court of appeals weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Eastley* at ¶ 20.

{¶ 41} In conducting our review, we must make every reasonable presumption in favor of the juvenile court's findings of fact and judgment. *L.W.* at ¶ 8; *Eastley* at ¶ 21, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984), fn. 3. " '[I]f the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the trial court's verdict and judgment.' " *L.W.* at ¶ 8, quoting *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19 (1988). Moreover, we recognize that "[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceedings and the impact the court's determination will have on the lives of the parties concerned." (Internal quotations and citation omitted.) *In re W.D.*, 10th Dist. No. 09AP-589, 2009-Ohio-6903, ¶ 34, quoting *In re A.L.D.*, 10th Dist. No. 08AP-238, 2008-Ohio-3626, ¶ 8.

## V. Weight and Sufficiency of the Evidence Regarding Best Interests Conclusion

{¶ 42} In A.D.'s first assignment of error and R.S.'s first and second assignments of error in part, A.D. and R.S. assert the juvenile court's decision to grant the motion for permanent custody was against the manifest weight of the evidence and not supported by sufficient evidence. Initially, we note that neither A.D. nor R.S. challenge the juvenile court's determination, pursuant to R.C. 2151.414(B)(1)(d), that the children had been in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period.[3] Therefore, we review whether the juvenile court's conclusion that granting permanent custody to FCCS was in the best interests of the children was supported by the manifest weight of the evidence. *See L.W.* at ¶ 13.

---

[3] We note that A.D., in a footnote in her brief, disputes the juvenile court's alternative findings under R.C. 2151.414(B)(1)(a) and (b) that the children could not be returned to the parents within a reasonable amount of time and that the children were abandoned. However, as A.D. acknowledges, because there is no contest regarding the R.C. 2151.414(B)(1)(d) factor, we need not consider the juvenile court's alternative holdings under the remaining R.C. 2151.414(B)(1) factors.

**A. Children's Interactions and Relationships**

{¶ 43} The first factor in determining whether a grant of permanent custody is in the children's best interests requires considering the interaction and interrelationship of the children with their parents, siblings, relatives, foster caregivers, and others. R.C. 2151.414(D)(1)(a). The juvenile court found both children had a bond with A.D., who had recently been more consistent with her visits and had appropriate interactions during her time with the children. However, the court found that A.D. had no contact with the children for an extensive period of time from December 2017 until July 2018. The court noted that A.D. failed to justify her absence from the children's lives during that time.

{¶ 44} The juvenile court found both children were bonded with R.S. The court found, however, that R.S. had no contact with R.G.S. from November 2017 until August 2018. The court noted R.S. stated he was often unable to visit due to hospitalizations and health issues; however, R.S. was not hospitalized during the time period in question. The court found the foster parent had provided for the children's daily needs and was invested in creating a permanent home for the children.

{¶ 45} Testimony reflected that the children were bonded with each other, A.D., R.S., and their foster parent. Taylor testified that A.D. and R.S. visited the children together. At the visits, A.D. and R.S. engaged in appropriate behavior with the children, playing games and discussing birthdays and holidays. However, from November 2016 until November 2017, A.D. and R.S. missed 14 visits. Between December 2017 and July 2018, a period of approximately eight months, neither A.D. nor R.S. visited the children at all. A.D. and R.S. resumed visiting the children in August 2018 and had missed 13 visits between that date and the permanent custody hearing on October 1, 2019.[4] Furthermore, Taylor stated the children needed family counseling to address issues resulting from having witnessed A.D. and R.S. abusing drugs.

{¶ 46} Taylor testified the children's foster parent had established a routine with the children, made sure their emotional needs were met and nurtured, and that any behavioral issues were addressed. The children laughed and played with their foster parent.

---

[4] We note that, according to Taylor, R.S. was unable to visit due to health reasons from October 2016 through August 2017 and again from February through March 2019.

According to Nunez, the foster parent was able to have fun with the children and also serve as a disciplinarian.

## B. Children's Wishes

{¶ 47} The second factor in determining whether a grant of permanent custody is in the children's best interests requires considering the wishes of the children, as expressed directly by the children or through the children's GAL. The court must give due regard to the children's maturity. R.C. 2151.414(D)(1)(b).

{¶ 48} Nunez testified both children had changed their preferences for placement over the course of the case. At the time of the hearing, A.S. wished to be adopted by the foster parent, whereas R.G.S. wished to be placed with A.D. and R.S. Nunez recommended the juvenile court grant the motion for permanent custody because of the need of the children to receive closure and finality due to the long duration of the case.

## C. Custodial History

{¶ 49} The third factor in determining whether a grant of permanent custody is in the children's best interests requires considering the children's custodial history, including whether they have been in the temporary custody of a public service agency for 12 or more months of a consecutive 22-month period. R.C. 2151.414(D)(1)(c). The juvenile court found the children had been in the continuous custody of FCCS for greater than 12 months. Neither A.D. nor R.S. dispute this finding on appeal.

## D. Provision of a Legally Secure Permanent Placement

{¶ 50} The fourth factor in determining whether a grant of permanent custody is in the children's best interests requires considering the children's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody to a public agency. R.C. 2151.414(D)(1)(d). The juvenile court found both children were in need of a legally secure permanent placement and such placement could only be achieved by granting permanent custody to FCCS. In making this determination, the juvenile court examined A.D. and R.S.'s progress on their case plans.

{¶ 51} In December 2016, the juvenile court magistrate adopted the case plans and made the same an order of the court. The case plan provided both A.D. and R.S. with the following objectives: (1) complete a drug and alcohol assessment and follow any provider recommendations; (2) complete random screens to demonstrate sobriety; (3) complete

parenting education classes; (4) complete a domestic violence assessment and follow any provider recommendations; (5) participate in visitation with the children; and (6) obtain a legal source of housing and income.  In the nearly three years between that time and the permanent custody hearing, the record reflects that A.D. and R.S. had not fully completed their case plan objectives.  Furthermore, A.D. and R.S. began making progress on several objectives only shortly before the permanent custody hearing.

{¶ 52}  First, with regard to completing drug and alcohol assessments, A.D. and R.S. had only recently begun to receive treatment for their admitted abuse of drugs.  A.D. started participating in drug and alcohol counseling in 2019 but had not completed treatment.  R.S. began alcohol and drug treatment in May 2019.

{¶ 53}  Second, A.D. and R.S. were required to submit to random drug screens administered by ACS and consistently receive negative results in such screens.  A.D. missed 188 of 213 random drug screens over the course of the case.  A.D. points to the results of hair follicle tests to demonstrate her sobriety.  However, she does not dispute that she was ordered to complete random screens or that she failed to consistently complete such screens.  R.S. did not begin participating in random drug screens until August 2019 and had missed four of six screens.

{¶ 54}  Third, it is uncontested that A.D. and R.S. completed parenting classes.  Fourth, both A.D. and R.S. failed to complete a domestic violence assessment.  Fifth, as previously discussed, the record reflects that A.D. and R.S. missed a substantial number of visits with the children.  After being absent for approximately eight months, A.D. and R.S. resumed visiting the children in August 2018 and had missed 13 visits between such time and the permanent custody hearing on October 1, 2019.

{¶ 55}  Sixth, with regard to obtaining a legal source of housing and income, the juvenile court found A.D. had provided documentation of a legal source of income.  However, the court found there had not been sufficient time to demonstrate whether this income was stable when viewed in light of the history of instability over the course of the case.  The juvenile court found R.S. had demonstrated a stable income sufficient to provide for his needs, but it was not sufficient to provide for the children's needs on a consistent basis.  The court found that although A.D. and R.S. had recently obtained independent

housing, there had not been sufficient time to determine whether such housing was permanent and suitable for the children.

{¶ 56} Finally, the juvenile court also found the foster parent provided for the children's daily needs on a consistent basis. According to Taylor, the foster parent was a potential adoptive placement for the children.

{¶ 57} Both A.D. and R.S. dispute the juvenile court's finding that they failed to meet case plan requirements regarding obtaining legal sources of housing and income. Indeed, Taylor testified A.D. and R.S. had obtained legal sources of housing and income. However, Taylor also stated that because A.D. and R.S. had only moved into their present residence in June 2019, there had not been sufficient time to demonstrate they could maintain stable housing given their history of instability.

{¶ 58} Ultimately, it is unnecessary for us to resolve whether or not the juvenile court correctly found A.D. and R.S. failed to meet the case plan requirements regarding obtaining legal sources of housing and income. Clear and convincing evidence exists in the record to support the juvenile court's findings that A.D. and R.S. failed to complete the remaining objectives of the case plan, including completing an alcohol and drug assessment and following any provider recommendations, completing random drug screens and consistently receiving negative results, completing a domestic violence assessment and following any provider recommendations, and maintaining regular visitation with the children. Therefore, we cannot find the juvenile court erred in its determination under R.C. 2151.414(D)(1)(d) that the children were in need of a legally secure permanent placement and that such placement could not be achieved without granting the motion for permanent custody.

### E. Other Factors

{¶ 59} The fifth factor in determining whether a grant of permanent custody is in the children's best interests requires considering whether any of the factors listed in R.C. 2151.414(E)(7) through (11) apply. R.C. 2151.414(D)(1)(e). The juvenile court found that R.C. 2151.414(E)(10), which provides that "[t]he parent has abandoned the child," applied to both A.D. and R.S.

{¶ 60} R.C. 2151.011(C) provides that "[f]or the purposes of this chapter, a child shall be presumed abandoned when the parents of the child have failed to visit or maintain

contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." Here, the record reflects that A.D. and R.S. failed to visit the children for approximately eight months between December 2017 and July 2018. As a result, the juvenile court could properly have found that A.D. and R.S. abandoned the children, regardless of their later resumption of contact. *In re B.G.W.*, 10th Dist. No. 08AP-181, 2008-Ohio-3693, ¶ 17. In his brief, R.S. states that he "takes exception to the improper weight the trial court gave to this factor."[5] (R.S.'s Brief at 29.) However, R.S. provides no evidence or citation to authority demonstrating why the juvenile court's consideration of such factor was in error. Accordingly, we find no error.

## F. Conclusion Regarding Manifest Weight and Sufficiency Challenges

{¶ 61} The juvenile court, in considering the factors listed under R.C. 2151.414(D)(1)(a) through (e), concluded it was in the children's best interests to grant the motion for permanent custody. Having reviewed the totality of the record, including the case file and the testimony and exhibits introduced at the permanent custody hearing, we find clear and convincing evidence supported the juvenile court's best interests determination. Furthermore, in weighing the evidence, considering all reasonable inferences and the credibility of witnesses, we cannot find the juvenile court so clearly lost its way as to create a manifest miscarriage of justice. Therefore, we find the juvenile court's decision was supported by sufficient evidence and was not against the manifest weight of the evidence. *See In re L.B.*, 10th Dist. No. 19AP-644, 2020-Ohio-3045, ¶ 29, quoting *In re C.N.*, 10th Dist. No. 15AP-67, 2015-Ohio-2546, ¶ 9 (" '[T]hough sufficiency and manifest weight are different legal concepts, a finding that a judgment is supported by the manifest weight of the evidence necessarily includes a finding that sufficient evidence supports the judgment.' "). Accordingly, we overrule A.D.'s first assignment of error and R.S.'s first and second assignments of error in part.

## VI. Reasonable Efforts

{¶ 62} In A.D.'s second assignment of error, A.D. asserts the juvenile court erred in granting the motion for permanent custody because FCCS failed to make reasonable efforts to reunify A.D. with the children by facilitating group counseling and expanded visitation.

---

[5] We note that A.D. raises no argument related to the juvenile court's finding under R.C. 2151.414(D)(1)(e) or (E)(10).

Similarly, in R.S.'s first and second assignments of error in part, R.S. asserts FCCS failed to make reasonable efforts to facilitate R.G.S. and R.S.'s reunification.[6]

**{¶ 63}** R.C. 2151.413(D)(1) provides that "if a child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, the agency with custody shall file a motion requesting permanent custody of the child." R.C. 2151.413(D)(3) delineates several exceptions to the requirement to file a motion for permanent custody under R.C. 2151.413(D)(1). Under R.C. 2151.413(D)(3)(b), an agency may not file for permanent custody "[i]f reasonable efforts to return the child to the child's home are required under section 2151.419 of the Revised Code, [and] the agency has not provided the services required by the case plan to the parents of the child or the child to ensure the safe return of the child to the child's home."

**{¶ 64}** R.C. 2151.419(A)(1) provides as follows:

> Except as provided in division (A)(2) of this section, at any hearing held pursuant to section 2151.28, division (E) of section 2151.31, or section 2151.314, 2151.33, or 2151.353 of the Revised Code at which the court removes a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether the public children services agency or private child placing agency that filed the complaint in the case, removed the child from home, has custody of the child, or will be given custody of the child has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home.

---

[6] We note that, although R.S.'s assignments of error mention the failure of FCCS to make reasonable efforts to reunify R.S. with R.G.S., R.S. neither provides any arguments nor points to any evidence in the record to support the assertion of error. App.R. 16(A)(7) requires that appellant include in his/her brief "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." App.R. 12(A)(2) provides that "[t]he court may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief." " 'It is the duty of the appellant, not the appellate court, to construct the legal arguments necessary to support the appellant's assignments of error.' " *Cook v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 14AP-852, 2015-Ohio-4966, ¶ 40, quoting *Bond v. Canal Winchester*, 10th Dist. No. 07AP-556, 2008-Ohio-945, ¶ 16. Nevertheless, the court has decided to exercise its discretion to consider whether FCCS made reasonable efforts toward reunification of the children with both A.D. and R.S.

Furthermore, R.C. 2151.419(A)(1) provides that "[t]he agency shall have the burden of proving that it has made those reasonable efforts."  R.C. 2151.419(A)(2) provides as follows:

> If any of the following apply, the court shall make a determination that the agency is not required to make reasonable efforts to prevent the removal of the child from the child's home, eliminate the continued removal of the child from the child's home, and return the child to the child's home:
>
> * * *
>
> (d) The parent from whom the child was removed has abandoned the child.

{¶ 65}  The Supreme Court of Ohio has held that R.C. 2151.419 " 'does not apply to motions for permanent custody brought pursuant to R.C. 2151.413, or to hearings held on such motions pursuant to R.C. 2151.414.' "  *C.F.* at ¶ 41, quoting *In re A.C.*, 12th Dist. No. CA2004-05-041, 2004-Ohio-5531, ¶ 30.  *See In re A.N.F.*, 10th Dist. No. 17AP-905, 2018-Ohio-3689, ¶ 20; *In re E.R.*, 10th Dist. No. 17AP-82, 2017-Ohio-7188, ¶ 53.  However, the agency filling a motion for permanent custody "must still make reasonable efforts to reunify the family during the child-custody proceedings prior to the termination of parental rights."  *C.F.* at ¶ 43.  "If the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time."  *Id.*  "Thus, if the record reflects that the trial court has made a finding that the children services agency has made reasonable efforts as required by R.C. 2151.419(A)(1), the R.C. 2151.413(D)(3)(b) prohibition on filing a motion for permanent custody does not apply."  *E.R.* at ¶ 53.

{¶ 66}  Here, in the findings of fact and conclusions of law filed on October 18, 2017, the juvenile court magistrate found that FCCS "made reasonable efforts to finalize a permanency plan."  (Oct. 18, 2017 Findings of Fact and Conclusions of Law.)  At that time, the permanency goal for both children was reunification pursuant to the case plans.  No objections were made to the magistrate's decision.  In addition to the above magistrate's findings, the juvenile court, in its February 5, 2020 decisions and judgment entries, found FCCS "has made reasonable efforts to prevent or eliminate the need for removal of said children from the children's own home."  (Decision at 17.)  The court found that "[r]easonable efforts have also been made to finalize the permanency plan in effect for the children."  (Decision at 18.)  Furthermore, the trial court found that A.D. and R.S.

"abandoned their children." (Decision at 16.) Thus, pursuant to R.C. 2151.419(A)(2), the trial court was required to make a determination that reasonable efforts were not required. *See A.N.F.* at ¶ 23. Nevertheless, as discussed below, we find FCCS made reasonable efforts at reunification through their engagement with A.D. and R.S.'s case plans.

{¶ 67} The record shows a case plan was developed and efforts were made to assist A.D. and R.S. with progress toward reunification. A.D. testified her caseworker reviewed the case plan with her, provided referrals for case plan activities, provided assistance for securing housing, and was willing to provide bus passes, funds for gas, or fares for taxi rides as needed. Taylor testified both A.D. and R.S. had been linked with all the services required to complete their case plans. A.D. asserts that she should have been permitted expanded visitation with the children and that family counseling should have been made available. However, Taylor testified family counseling would not be appropriate because A.D. and R.S. had not completed enough random screens to demonstrate sobriety. We cannot find under the circumstances present in this case that FCCS failed to make reasonable efforts at reunification by expanding visitation and offering family counseling when A.D. and R.S. had not completed various other objectives of their case plan as previously discussed in our resolution of A.D. and R.S.'s manifest weight challenge. *See In re D.K.*, 10th Dist. No. 19AP-801, 2020-Ohio-5251, ¶ 32 (rejecting father's argument that children services agency failed to make reasonable efforts toward reunification of family where father failed to comply with case plan in over two years since it had been implemented); *In re S.T.*, 10th Dist. No. 19AP-24, 2019-Ohio-4341, ¶ 25.

{¶ 68} Finally, it is important to note the juvenile court acknowledged the recent progress both A.D. and R.S. had made on their case plans. Specifically, the court noted A.D.'s "recent efforts to resolve the issues which [led] to her children's removal, [including] significant substance abuse issues, homelessness, unemployment and instability" and that R.S. had "recently engaged in substance abuse treatment and random * * * screens." (Decision at 13-14.) Nothing in this decision should be read to diminish the recent progress made by A.D. and R.S. toward sobriety and stability. Ultimately, however, the issue before the trial court was not the ability of A.D. and R.S. to comply with their case plans. Given the history and circumstances present in this case, the record reflects that granting the

motion for permanent custody was in the best interests of the children and necessary for their welfare.

{¶ 69} Accordingly, we overrule A.D.'s second assignment of error and the remainder of R.S.'s first and second assignments of error.

## VII. Conclusion

{¶ 70} Having overruled A.D.'s two assignments of error and R.S.'s two assignments of error, we affirm the judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgments affirmed.*

LUPER SCHUSTER and BEATTY BLUNT, JJ., concur.